# In the
# United States Court of Appeals
## For the Seventh Circuit

_____

No. 05-1236

EAST ST. LOUIS LABORERS' LOCAL 100,

*Plaintiff-Appellee,*

v.

BELLON WRECKING & SALVAGE COMPANY,

*Defendant-Appellant.*

_____

Appeal from the United States District Court
for the Southern District of Illinois.
No. 05 C 23—**G. Patrick Murphy**, *Chief Judge.*

_____

ARGUED APRIL 15, 2005—DECIDED JULY 6, 2005

_____

Before FLAUM, *Chief Judge*, and BAUER and EVANS, *Circuit Judges.*

FLAUM, *Chief Judge.* A collective bargaining agreement ("CBA") obligates defendant Bellon Wrecking & Salvage Company to hire members of plaintiff East St. Louis Laborers' Local 100 to do certain highway construction work. Bellon and the union amended the agreement orally to permit the employer some latitude to use labor from outside Local 100 on a project in southwestern Illinois. The parties disagree about the extent of the oral amendments. When work slowed, Bellon laid off a member of Local 100 instead

of a laborer from a neighboring union. Local 100 believed this violated the agreement as amended, sued for breach of the CBA, and sought a preliminary injunction. The district court granted the injunction, and Bellon appeals. Because the union has not shown that it will suffer irreparable harm absent the injunction, we reverse.

## I. Background

In June 2004, Bellon was hired to remove the road deck from the MacArthur bridge, which spans the Mississippi River from St. Louis, Missouri to East St. Louis, Illinois. The project aimed at ensuring the bridge's structural integrity by removing excess weight from the bridge. The work began on the Missouri side of the river and moved east. At the time, Bellon employed laborers from a Missouri union, but had not signed a CBA with Local 100, whose jurisdiction covers the Illinois side of the river. When Local 100 learned of the work on the bridge, it requested that Bellon hire its members. Bellon refused, and the union picketed in protest. The picket ended after a week, and Bellon continued to use laborers from the Missouri union.

For reasons that are not clear from the record, in October 2004, Bellon signed on to a CBA already in effect among Local 100, the Southern Illinois Builders Association, the Southern Illinois Contractors Association, and other local employers. The agreement extends through July 31, 2006, and obligates signatories to use Local 100 as the exclusive source of referrals for highway construction laborers in East St. Louis and specified neighboring areas. The agreement provides that the union will maintain a list of eligible laborers; participating employers bind themselves to hire from the list.

The CBA sets forth a detailed schedule of wage rates for each laborer hired by an employer. The wage rates vary according to the type of job, the skills possessed by the

laborer, and the number of hours worked within a day or week. The agreement also obligates employers to contribute to a health and welfare fund on behalf of each laborer they hire.

Bellon and Local 100 acknowledge that they amended the agreement orally, although they disagree about the nature and extent of the changes.[1] Bellon contends that the union authorized it to employ John Fletcher, a laborer from a Missouri union, as its "lead person" on the MacArthur bridge. Fletcher had been working on the project from the outset, and Bellon valued his experience and loyalty. According to Bellon's depiction of the amendments, it would hire the second and third laborers from Local 100 as work on the bridge increased. Bellon would draw the fourth laborer from outside the union, and thereafter it would alternate between hiring one member from Local 100 and one laborer from outside that union. Bellon asserts that the parties designed this arrangement to maintain a 50-50 staffing ratio between members of Local 100 and other laborers.

Local 100 contends that it agreed to allow Bellon to use Fletcher's services, but only after the employer had hired two of the union's members. The order of hiring takes on importance because both parties agree that, in the event of a layoff, the last-hired worker would lose his job first. Moreover, the union asserts that the parties never contemplated a 50-50 staffing ratio, and that all other laborers would be hired from Local 100.

During October and the beginning of November 2004, the work on the bridge called for three laborers. Bellon hired

---

[1] We do not comment on whether the oral amendments were effective. For the purposes of this appeal, moreover, we assume without deciding that the union's account of the oral amendments is accurate, and that Bellon breached the agreement as amended.

Fletcher and two members of Local 100: Sean Abernathy and Leroy Bailey. Heavy rains on November 11, 2004 destabilized the footing of a crane that the three men had been using to demolish the road bed. Without the crane, Bellon could utilize only two laborers. It told Abernathy not to report to work the next day. Nevertheless, Abernathy showed up on November 12 and argued that Fletcher, not he, should be laid off. Bellon disagreed, asserting that Abernathy held the least tenure of the three workers, and therefore should be laid off first. Both Abernathy and Bailey left the job site in protest, returning some time later to picket. Bellon hired replacement workers from outside Local 100 to work on the bridge. As of oral argument before this Court, the work on the bridge continued.

On January 13, 2005, the union filed suit for breach of the CBA in the Circuit Court of St. Clair County, Illinois. The state court issued a temporary restraining order directing that Bellon adhere to the CBA.

Bellon removed the case to federal court under § 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185, and § 502 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132. On January 25, 2005, the district court held a hearing on Bellon's motion to dissolve the temporary restraining order and the union's motion to convert the restraining order into a preliminary injunction. After taking testimony from both parties, the district court found the union's witnesses credible, rejected Bellon's version of events, and held that Local 100 had established a likelihood of success on the merits. It held, moreover, that the union would suffer irreparable harm absent an injunction, that Bellon would not be harmed by an injunction, and therefore that the balance of harms tipped in the union's favor. Accordingly, it issued a preliminary injunction mandating that Bellon comply with the union's account of the amended CBA pending a trial on the merits. Bellon appeals the order issuing the preliminary injunction.

## II. Discussion

The Norris-LaGuardia Act cabins a district court's power to issue injunctive relief in cases "involving or growing out of a labor dispute." 29 U.S.C. § 101. As explained below, a court enjoys far less leeway to issue a preliminary injunction in a case governed by the Act than it does under traditional equitable principles. Bellon argues that the Norris-LaGuardia Act controls this case, and that judging by the Act's strict standards, the district court abused its discretion by issuing the injunction. The union contends that the Act does not apply here for two reasons: first, it argues that the statute does not protect employers; second, it contends that the facts of this case fall within an exception to the Act recognized by *Boys Markets, Inc. v. Retail Clerks Union, Local 770*, 398 U.S. 235 (1970), and its progeny. The union urges us instead to apply traditional equitable principles, under which, it contends, the injunction should stand. We need not decide which framework governs this case, however. Both tests require the movant to show, at a minimum, that it will suffer irreparable harm absent the injunction. Because the union has not made this threshold showing, it is not entitled to a preliminary injunction under either analysis.


## A.  Traditional Equitable Principles

Our traditional approach to preliminary injunctions requires that the party seeking the injunction demonstrate, among other things, "that it has 'no adequate remedy at law' and will suffer 'irreparable harm' if preliminary relief is denied." *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 11 (7th Cir. 1992). If the moving party cannot make this showing, "a court's inquiry is over and the injunction must be denied." *Id.* We review the district court's decision to issue a preliminary injunction for abuse of discretion. *Id.* at

12. A court abuses its discretion when it commits an error of law or makes a factual finding that is clearly erroneous. *Id.* at 13.

The union offers several arguments as to why it will suffer irreparable harm in the absence of a preliminary injunction. First, it contends that Bellon has violated the CBA repeatedly, and would continue to do so but for the injunction. Even if this is true, it establishes only that Bellon's actions may harm the union; it does not prove that the harm will be irreparable. An injury is irreparable for purposes of granting preliminary injunctive relief only if it cannot be remedied through a monetary award after trial. *See Graham v. Med. Mut. of Ohio*, 130 F.3d 293, 296 (7th Cir. 1997). Thus, even repeated and ongoing violations of a CBA do not warrant a preliminary injunction if each violation may be remedied by a monetary award.

Relying on *Duct-O-Wire Co. v. U.S. Crane, Inc.*, 31 F.3d 506 (7th Cir. 1994), the union asserts that an ongoing violation amounts to irreparable harm. Plaintiff overreads *Duct-O-Wire*. In that case, the defendant subscribed to a telephone number that it knew the plaintiff previously had used for its business. When customers called the number looking to buy the plaintiff's products, the defendant led them to believe that it was the plaintiff's agent. This enabled the defendant to capture the plaintiff's sales and deprived the plaintiff of "the opportunity to maintain and develop relationships with existing and potential customers." *Id.* at 509-10. Because the value of the diverted sales and lost opportunities would have been impossible to track, the plaintiff would have suffered irreparable harm without an injunction. The injunction was warranted not because the harm was ongoing, but because it was irreparable. Here, Local 100 does not explain why ongoing violations of the CBA could not be atoned for with money.

Second, plaintiff argues that its members will lose confidence in the union if, pending trial, Bellon is permitted to

flout the parties' agreement with apparent impunity. Plaintiff contends that this loss of confidence cannot be measured in or remedied with dollars, and can be prevented only through an immediate injunction.

Not every conceivable injury entitles a litigant to a preliminary injunction. For example, speculative injuries do not justify this extraordinary remedy. *See, e.g., Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 37 (2d Cir. 1995); *Pub. Serv. Co. of N.H. v. Town of W. Newbury*, 835 F.2d 380, 383 (1st Cir. 1987); *Goldie's Bookstore, Inc. v. Superior Court*, 739 F.2d 466, 472 (9th Cir. 1984). *Cf. Am. Hosp. Supply Corp. v. Hosp. Prods. Ltd.*, 780 F.2d 589, 595 (7th Cir. 1986). The union's concern about lost confidence falls into that category. Given the frequency of litigation between unions and employers, Local 100's members likely understand that lawsuits take time to resolve disputes, and that the absence of an immediate victory does not imply defeat. The union is free to explain the difficulties of litigation to its members if they ask why more is not being done sooner. And if some members' confidence is shaken, the chance that vindication of the union at trial would not restore that confidence is too speculative to justify a preliminary injunction.

Furthermore, accepting the plaintiff's argument would open the door to preliminary injunctive relief in a substantial majority of cases. Nearly every litigant will prefer an immediate injunction to a monetary award sometime in the future. Many will be able to construct an argument that a non-party with an interest in its success will lose confidence in its ability to control the dispute absent an immediate, drastic remedy. But the unease that often accompanies litigation is one of the ordinary burdens of our legal system that, like litigation expense, *Renegotiation Bd. v. Bannercroft Clothing Co., Inc.*, 415 U.S. 1, 24 (1974), does not qualify as the type of injury warranting a preliminary injunction.

Third, the union fears that Bellon may complete its work on the MacArthur bridge before the district court can hold a trial. If so, plaintiff's members will never again work on the bridge without the benefit of an injunction. The union characterizes this as a permanent job loss which, it asserts, amounts to irreparable harm.

A permanent loss of employment, standing alone, does not equate to irreparable harm. *See, e.g., Shegog v. Bd. of Educ. of City of Chi.*, 194 F.3d 836, 839 (7th Cir. 1999) (affirming denial of preliminary injunction where laid off teachers failed to show irreparable harm); *Hetreed v. Allstate Ins. Co.*, 135 F.3d 1155, 1158 (7th Cir. 1998) (fired employee not entitled to preliminary injunction because she failed to show irreparable injury, among other things); *E.E.O.C. v. City of Janesville*, 630 F.2d 1254, 1259 (7th Cir. 1980) (district court abused its discretion by reinstating fired police chief pending trial on the merits given the lack of irreparable harm). Rather, as in other cases involving preliminary injunctive relief, we ask whether the termination will harm the plaintiff in a way that cannot be remedied through money. *See id.* ("Reinstatement pending a trial on the merits . . . is an extraordinary remedy permissible only upon a substantial showing of irreparable injury.").

Our opinion in *Local Lodge No. 1266, International Association of Machinists & Aerospace Workers, AFL-CIO v. Panoramic Corp.*, 668 F.2d 276 (7th Cir. 1981), upon which plaintiff relies, is not to the contrary. Although we stated in *Panoramic* that damages would not adequately remedy a permanent loss of jobs, *id.* at 286, that language must be read in context. Panoramic was threatening to sell a manufacturing division that employed 113 workers to a group of investors who intended to fire all of the workers once the sale closed. We affirmed the district court's grant of a preliminary injunction preventing the sale until an arbitrator could determine whether the transaction violated a CBA between the workers' union and Panoramic. Our

conclusion that the union would suffer irreparable harm was driven in large part by the practical impossibility of fashioning a damage remedy under these circumstances. The arbitrator would have been required to calculate the damages suffered by each of 113 workers involved in a complex, interrelated organization. But for the sale, the division would have continued in operation as a going concern, employing these workers for an unknowable length of time. This case does not present similar problems. The work on the MacArthur bridge is a discrete project that has created two jobs for the union's laborers. Although we do not know precisely how long it will take, the length of the project will be readily apparent after the fact. That the laborers may lose their jobs on the bridge permanently does not imply that the harm could not be remedied by a monetary award.

Fourth, the union contends that Bellon may breach the CBA in a way that will trigger some lost wages that cannot be calculated. Plaintiff concedes that any wages lost because of Bellon's refusal to employ its members on the MacArthur bridge may be calculated with ease. The CBA sets forth a detailed schedule of hourly wages broken down by job type. The union could learn through discovery the number of laborers, type of work, and person-hours demanded by the bridge project, and apply the relevant wage rate to determine lost wages. The union asserts, however, that it cannot calculate the wages that may be lost if Bellon takes on additional construction projects within the CBA's territorial jurisdiction but refuses to hire Local 100's laborers. Because we cannot anticipate the type of work or number of person-hours those projects will require, plaintiff alleges that it is impossible to calculate the related damages.

We disagree. A plaintiff may suffer irreparable harm if the nature of the loss makes monetary damages difficult to calculate. *Somerset House, Inc. v. Turnock*, 900 F.2d 1012,

1018 (7th Cir. 1990). The harm plaintiff points to, however, eludes calculation because it is speculative, not because, if it occurred, it could not be quantified. As stated above, a plaintiff cannot obtain a preliminary injunction by speculating about hypothetical future injuries. *Tom Doherty Assocs.*, 60 F.3d at 37. Thus, the union's argument that we cannot know whether or how Bellon might breach the agreement in the future merely reveals that an injunction is not warranted. If the union's predictions come true, a jury could apply the same straightforward method of calculating lost wages from the future projects as it would with the work on the MacArthur bridge.[2]

Fifth, the union asserts that injunctive relief is necessary because it will avoid logistical problems that would hamper a suit for money damages. It points out that the CBA establishes a referral system, rather than identifying specific members of the union to work on particular projects. The union maintains a list of eligible employees from which it makes its referrals, and signatories agree to hire members from the top of the list. When the work on the MacArthur bridge began, Bellon hired Sean Abernathy and Leroy Bailey because they happened to be on the top of this list. If Bellon is permitted to lay off Abernathy and Bailey, the two will be forced to look for other work. If they find jobs (thereby mitigating their damages for lost wages), plaintiff submits it will be impossible to determine which

---

[2] The union cites *Sheet Metal Workers' International Association Local 19 v. Herre Bros., Inc.*, 201 F.3d 231, 250 (3d Cir. 1999), to support its argument that a preliminary injunction should issue when the plaintiff cannot predict how the defendant will breach a contract in the future. *Herre Bros.* addressed whether a district court had abused its discretion by ordering specific performance after a judgment had been entered on the merits. It did not discuss whether a preliminary injunction would have been appropriate, and therefore it is irrelevant to this appeal.

union member was harmed by Bellon's breach of the CBA. According to the union, the answers could include the next-listed unemployed member on the day the work began, any member who sat idle over the course of the project, or a combination of unemployed members. Plaintiff contends that a preliminary injunction would avoid this conundrum.

This argument proceeds from the flawed assumption that one measures the adequacy of a legal remedy by a court's ability to impose it prior to any discovery. The test of a monetary award, however, is whether it fairly compensates a plaintiff after trial, *Graham*, 130 F.3d at 296; *Anderson v. U.S.F. Logistics (IMC), Inc.*, 274 F.3d 470, 478 (7th Cir. 2001), and therefore after discovery has been completed. Before discovery has begun, uncertainty will often exist about an issue of fact—like causation—bearing on damages. A rule that permitted injunctive relief solely because of this uncertainty would give litigants a perverse incentive to avoid doing their homework.

An injunction might be warranted if the nature of the case caused us to doubt the litigants' ability, though pursuing discovery diligently and in good faith, to prove some fact even if it were true. The union has not shown, however, that the facts of this case are unproveable. Ordinary discovery will reveal the number of laborers called for by the MacArthur bridge project, their qualifications, and the days and hours they worked. This data may be compared to the union's referral lists to determine which of plaintiff's members, if any, were qualified and available to work on the bridge and failed to find other employment. Depending upon the details of the union's referral practice, and applying ordinary principles of causation, it is likely that the parties will be able to identify which member or members were harmed by Bellon's breach of the CBA. We sketch this approach neither to identify which member was harmed nor to mandate a comprehensive plan for discovery. Rather, we

present the outline to demonstrate the parties' ability to resolve the issue by applying ordinary legal principles and discovery tools.

Sixth, the union contends that Bellon's breach of the CBA may cause plaintiff's members to lose fringe benefits. The CBA requires that employers contribute a fixed amount per hour worked by a member into a health and welfare fund on that member's behalf. When they are not working, members do not earn contributions towards these funds, and their health care coverage may lapse. The union asserts that a member could lose coverage because of Bellon's actions, fall ill, and be forced to pay his or her health care costs out of pocket.

The union has not shown that this is likely. It has not informed us of the minimum number of hours a member must work to be eligible for coverage, nor has it explained why the handful of laborers who might have worked on the MacArthur bridge will be unable to reach that threshold by working for other signatories to the CBA. Assuming that it might occur, a loss of fringe benefits does not amount to irreparable harm if the district court holds the power, following a judgment on the merits, to order the losing party to pay missed contributions. *See Adams v. City of Chicago*, 135 F.3d 1150, 1154-55 (7th Cir. 1998). Section 301 of the LMRA grants district courts that authority. *See* 29 U.S.C. § 185; *Galindo v. Stoody Co.*, 793 F.2d 1502, 1516 (9th Cir. 1986). *Cf. Contempo Design, Inc. v. Chi. & N.E. Ill. Dist. Council of Carpenters*, 226 F.3d 535, 553-55 (7th Cir. 2000). Moreover, plaintiff has not explained why its members could not purchase individual health insurance to hedge against a catastrophic loss. Although the premiums for individual insurance are likely higher than contributions to the health and welfare fund, a monetary award could include the difference as incidental damages.

In sum, the union has failed, as a matter of law, to demonstrate that it will suffer irreparable harm in the absence of a preliminary injunction.

## B.  Norris-LaGuardia Act

If the Norris-LaGuardia Act applies to this case, the union fares no better. The Act states that "[n]o court of the United States . . . shall have jurisdiction to issue any restraining order or temporary or permanent injunction in a case involving or growing out of a labor dispute, except in strict conformity with the provisions of [the Act]." 29 U.S.C. § 101. Subject to a categorical ban on injunctions not at issue here,[3] § 7 of the Act permits a court to issue an injunction only if it finds:

> (a) That unlawful acts have been threatened and will be committed unless restrained or have been committed and will be continued unless restrained . . . ;
>
> (b) That substantial and irreparable injury to complainant's property will follow;
>
> (c) That as to each item of relief granted greater injury will be inflicted upon complainant by the denial of relief than will be inflicted upon defendants by the granting of relief;
>
> (d) That complainant has no adequate remedy at law; and
>
> (e) That the public officers charged with the duty to protect complainant's property are unable or unwilling to furnish adequate protection.

29 U.S.C. § 107. As under our traditional analysis, we review preliminary injunctions in cases governed by the Act

---

[3]  *See* 29 U.S.C. § 104.

for abuse of discretion, deferring to a district court's factual findings unless clearly erroneous, but reviewing its legal conclusions de novo. *See United Air Lines, Inc. v. Int'l Assoc. of Machinists & Aerospace Workers, AFL-CIO*, 243 F.3d 349, 360-61 (7th Cir. 2001).

The union has not presented any evidence that Bellon has threatened or committed "unlawful acts" as contemplated by § 7(a) of the Act. *See Marine Transp. Lines, Inc. v. Int'l Org. of Masters, Mates & Pilots*, 770 F.2d 1526, 1530 (11th Cir. 1985) (suggesting that "unlawful acts" may be limited to things akin to "violence, intimidation, threats, vandalism, breaches of the peace and criminal acts"); *see also Wilson & Co. v. Birl*, 105 F.2d 948, 952 (3d Cir. 1939) (construing "unlawful acts" narrowly). Nor has plaintiff alleged that public officials are unwilling or unable to protect it from these acts, as required by § 7(e). Neither party addressed these points, however, and we do not rest our conclusion on them.

Rather, our holding that the union has not shown irreparable harm under traditional equitable principles also dooms plaintiff's chances for purposes of the Norris-LaGuardia Act. Given the Act's goal of limiting injunctive relief in labor disputes, *see AT&T Broadband, LLC v. Int'l Bhd. of Elec. Workers*, 317 F.3d 758, 760-61 (7th Cir. 2003), we have no reason to suspect that § 7(b)'s requirement of "substantial and irreparable injury" is less exacting than equity's demand of "irreparable harm."[4] Nor does plaintiff argue that these standards differ. Accordingly, the union has not demonstrated that it will suffer substantial and irreparable injury, and is not entitled to an injunction under the Act. We do not resolve whether it has met the Act's other requirements.

---

[4] We do not consider whether § 7(b) might demand a stronger showing.

### III. Conclusion

Whether this case is governed by traditional equitable principles or the Norris-LaGuardia Act, the union may obtain a preliminary injunction only if it shows that it will suffer irreparable harm absent the relief. Because it failed to make that showing as a matter of law, the district court abused its discretion by granting the injunction. Accordingly, we REVERSE and REMAND with the instruction that the district court dissolve the preliminary injunction.

A true Copy:

Teste:

_____
*Clerk of the United States Court of Appeals for the Seventh Circuit*