In the

# United States Court of Appeals
## For the Seventh Circuit

No. 08-2819

RIVER OF LIFE KINGDOM MINISTRIES,

*Plaintiff-Appellant*,

*v.*

VILLAGE OF HAZEL CREST,

*Defendant-Appellee*.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 08 C 950—**Joan B. Gottschall**, *Judge*.

ARGUED OCTOBER 22, 2008—DECIDED OCTOBER 27, 2009

Before CUDAHY, MANION, and WILLIAMS, *Circuit Judges*.

WILLIAMS, *Circuit Judge*.  River of Life Kingdom Minis-
tries ("the Church") attempted to relocate its congrega-
tion from a crowded warehouse in Chicago Heights to
its very own property—a dated fixer-upper in a blighted
community in the Village of Hazel Crest. The problem
was the Village had a zoning ordinance in place that
designated the area a "Service Business District." The
ordinance permitted a number of commercial uses for the

property, but not religious services. The Church was aware of this ordinance, but it bought the property anyway hoping it would receive a special use permit, a form of relief, which, unbeknownst to the Church, was no longer available under the current zoning ordinance. So the Church sued the Village under the Religious Land Use and Institutionalized Persons Act ("RLUIPA") to allow it to relocate to the business district. Before the case could be decided on the merits, the Church filed a motion for preliminary injunction to allow it to relocate to the property in the interim. The district court denied the motion and the Church appealed. We conclude that the Church has only a slim chance of success on the merits and that any irreparable harm it may suffer does not significantly outweigh the potential harm to the Village. As a result, we affirm the district court's denial of the Church's motion for preliminary injunction.

## I. BACKGROUND

River of Life Kingdom Ministries is a nonprofit religious organization with approximately sixty-seven members. Every Sunday, approximately thirty members of the Church assemble for worship in a Chicago Heights warehouse that it rents from a larger church. (About half of its members regularly attend services.) It also holds weekly Wednesday-night Bible study sessions and a women's ministry every third Saturday of the month. In addition to these services, the Church wanted to do more for its members and the community. Among its goals were promoting literacy, empowering communities,

developing leaders, transforming economic conditions, and improving life, health, and safety for local citizens, all through the teaching and application of the principles of the word of God. *River of Life Kingdom Ministries, Inc. Business Plan* 1.1. For these purposes, its current location was unsuitable. It only had access to the warehouse for five to six hours a week, the facility was continually dirty and lacked heat and air conditioning, and, to top it off, it had to share the space with two other churches.

In the fall of 2006, the Church decided to purchase its own facility and focused its attention on the property at 16842 Park Avenue in the Village of Hazel Crest, a suburb twenty-five miles south of Chicago with a population near 15,000. The property is located in the oldest part of the Village (called Hazel Crest Proper), which is marred by vacant storefronts, run-down houses, and underperforming public schools. This part of the Village has been in serious decline since the 1990s. To the Church, this neighborhood in economic decline presented a valuable opportunity to implement its ministry goals and to contribute to neighborhood revitalization through a "grass roots, hands on approach . . . ." Among the activities planned to implement its goals were: Bible study for the residents, seminars, mentoring programs, tutorial services, and even a few small businesses to help spur the local economy.[1]

---

[1] The Church hoped to open a bookstore that would also sell hand-crafted spa and beauty products and also planned to make office space available for start-up businesses.

By the time the Church began negotiations with the property owner on the terms of the sale, the Village had adopted a series of zoning ordinances and established a Tax Increment Financing ("TIF") plan. The Village's objective was to "provide an attractive commercial area that enhanced the regional image of Hazel Crest" and, particularly, to revitalize the run-down area near the Metra train station. Pursuant to this goal, Hazel Crest Proper (the "B-2 Service Business District") under the Village's zoning ordinance was designated a TIF district. This allowed the municipality to invest public funds in improvements to the area, including building new infrastructure and land acquisition. As the redevelopment kicked in, the additional tax revenue generated would then be used to repay the municipality. The zoning ordinance, which implemented the redevelopment plan, allowed general commercial and retail uses, gas stations, hotels, taverns, offices, and meeting halls to locate in the area as permitted uses. There is some indication, however, that the revitalization planned by the Village is still a few years and a few million dollars away from realization.[2]

The Village's zoning regulations prompted the Church to include a contingency in the sales contract conditioning closing on its ability to obtain a special use permit. However, due to erroneous legal advice or mistaken reliance on an outdated 1998 ordinance, the Church

---

[2] According to the Village, the total timeline for the plan was 23 years, and we are in year 9. Also, at the time of this appeal, the Village has raised approximately $500,000 of the $12 million required.

later waived this contingency and purchased the property in October 2007. Soon after, the Church filed an application for special permission to use the property, which the Village denied. The Church also applied for a special-use exception which the Village Board of Trustees also denied.

On February 15, 2008, the Church filed a complaint and motion for a temporary restraining order and preliminary injunction to prevent the Village from enforcing the zoning ordinance. The five-count complaint alleged that the ordinance violated the First Amendment, the Equal Protection clause, and the Substantial Burden and Equal Terms provisions of RLUIPA. The district court denied the temporary restraining order; however, while the motion for preliminary injunction was still pending before the court, the Village amended its ordinance to also exclude community centers, non-religious schools, meeting halls, art galleries, and recreational buildings, among other uses, from zone B-2. Both parties appear to concede that the strategy for this amendment was to bring the zoning ordinance into compliance with RLUIPA.

The district court allowed the Village to supplement the record with the amended ordinance, and it then

denied the Church's motion for preliminary injunction.[3] It is from this order that the Church now appeals.

## II. ANALYSIS

"[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (citation omitted). To obtain such relief, the moving party must first demonstrate that it has a reasonable likelihood of success on the merits, lacks an adequate remedy at law, and will suffer irreparable harm. *See Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S., Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008). The court must then balance, on a sliding scale, the irreparable harm to the moving party with the harm an injunction would cause to the opposing party. *Id*. The greater the likelihood of success, the less harm the moving party needs to show to obtain an injunction, and vice versa. *Id*. The court must also consider whether the public interest "will be harmed sufficiently that the injunction should be denied." *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006). We review the district court's legal conclusions

---

[3] The Church did not adequately brief, and the district court did not consider, the First Amendment or Equal Protection claims. The Church's brief focuses solely on the violation of RLUIPA's Equal Terms provision; therefore, we limit our review to this issue. *See Hentosh v. Herman M. Finch Univ. of Health Scis./The Chi. Med. Sch.*, 167 F.3d 1170, 1173 (7th Cir. 1999) ("Arguments not raised in an opening brief are waived.").

de novo, its findings of fact for clear error, and its balancing of harms for abuse of discretion. *Coronado v. Valleyview Pub. Sch. Dist. 365-U*, 537 F.3d 791, 795 (7th Cir. 2008).

### A. Church is Unlikely to Succeed on the Merits

The first part of our analysis requires us to address the strength of the Church's suit. The Church argues that the ordinance violates the Equal Terms provision of RLUIPA, which states: "No government shall impose or implement a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a non-religious assembly or institution." 42 U.S.C. § 2000cc(b)(1). We review de novo the district court's determination that the Church is likely to succeed on the merits of its RLUIPA claim. *See Christian Legal Soc'y*, 453 F.3d at 859.

The Church claims that the Village's ordinance, even as amended, violates the Equal Terms provision because it allows non-religious assemblies to locate within the B-2 district. Relying on *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1230 (11th Cir. 2004), the Church interprets the term "assembly" to include gymnasiums, health clubs, salons, day care centers, and hotels, all of which are permitted uses under the Village's ordinance. The Church argues that, because the ordinance allows these assemblies but excludes the Church's proposed use, the ordinance treats religious assemblies on less than equal terms with non-religious ones, thus violating RLUIPA. The Village, on the other hand, argues that it cured any potential RLUIPA concerns after its amendment

removed "meeting halls" and other non-commercial institutions from the list of permissible uses. According to the Village, hotels, commercial gyms, health clubs, and the other uses raised by the Church cannot be considered assemblies, even under *Midrash*'s definition. The Village also directs our attention to the Third Circuit's approach in *Lighthouse Institute for Evangelism, Inc. v. City of Long Branch*, which requires a plaintiff to identify a better-treated non-religious institution that is similarly situated in regards to the regulatory purposes of the land-use regulation. 510 F.3d 253 (3d Cir. 2007). This approach, the Village argues, is even more favorable to its position although it still believes it will prevail under either standard. We have not had the opportunity to discuss at length the contours of the Equal Terms provision, but we benefit from the Third and Eleventh Circuits'

thoughtful discussion on the issue.[4] We analyze their holdings accordingly.

In *Midrash*, the Eleventh Circuit held that a town's ordinance that prevented a synagogue from relocating in the business district violated RLUIPA's Equal Terms provision. The district in question was created to "provide for retail, shopping and personal service needs of the town's residents and tourists," but also permitted theaters, restaurants, private clubs, and lodge halls within its boundaries. *Id*. at 1220. Using the "ordinary or natural meaning" of "assembly," as defined by Webster's and Black's Law Dictionary, the court found that private clubs and lodges were also assemblies similarly situated to churches and synagogues. *Id*. at 1230-31. Therefore, to

---

[4] In *Vision Church v. Village of Long Grove*, we quoted *Konikov v. Orange County*, 410 F.3d 1317, 1324 (11th Cir. 2005), which stated that there were three kinds of Equal Terms statutory violations, the first one being "a statute that facially differentiates between religious and non-religious assemblies or institutions . . . ." 468 F.3d 975, 1003 (7th Cir. 2006). We also noted that we had not yet explored fully the contours of the Equal Terms provision, *id.*, and the case did not provide any further opportunity to do so. The plaintiff in *Vision Church* only challenged the special use permit requirement in the ordinance, and we held that the provision did not differentiate between religious and non-religious institutions; nor was there any other evidence of discriminatory intent. *See id*. We did not determine whether, for purposes of comparison under the Equal Terms provision, the plaintiff must show that it is similarly situated to other non-religious assemblies in relation to local government objectives.

exclude synagogues but permit private clubs was to treat a religious assembly on less than equal terms with a non-religious one. *Id*. at 1231. Although the court found that the ordinance violated RLUIPA, its inquiry did not stop there. The court applied strict scrutiny, determining whether the ordinance was narrowly tailored to advance a compelling interest. *Id*. Relying on the Supreme Court's decision in *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993), it determined that laws which were not neutral or generally applicable were subject to strict scrutiny. *Id*. at 1232. It then extended this principle to RLUIPA cases, stating:

> RLUIPA's equal terms provision codifies the *Smith-Lukumi* line of precedent. . . . A zoning law is not neutral or generally applicable if it treats similarly situated secular and religious assemblies differently because such unequal treatment indicates the ordinance improperly targets the religious character of an assembly. Thus a violation of § (b)'s equal treatment provision, consistent with the analysis employed in *Lukumi*, must undergo strict scrutiny.

*Id*.

The Third Circuit, on the other hand, adopted a slightly different approach. A church argued that a plaintiff alleging a violation of the Equal Terms provision need only show that the city's regulation treats a non-religious assembly better than a religious assembly without regard to the objectives of the regulation. *Lighthouse*, 510 F.3d at 264. The court disagreed. It reasoned that Congress in-

tended to codify the existing free exercise clause jurisprudence, all of which considered regulations presumptively valid if they were neutral and of general applicability. *Id*. In other words, facial differentiation between religious and non-religious institutions alone was insufficient to demonstrate that the ordinance was non-neutral. Only when the institutions had the same effect on the city's objectives was the regulation discriminatory. The court also declined to incorporate strict scrutiny into the Equal Terms provision. Section (a)(1) of RLUIPA (the "Substantial Burden" provision) includes express language applying strict scrutiny to land regulations that impose a substantial burden on a person's religious exercise. The absence of such language in the Equal Terms provision, according to the court, demonstrated Congress's intent not to include it. *Id*. at 269. As a result, the Third Circuit held that "if a land-use regulation treats religious assemblies or institutions on less than equal terms with non-religious assemblies or institutions that are no less harmful to the governmental objectives in enacting the regulation, that regulation—without more—fails under RLUIPA." *Id*. at 269. Applying this interpretation, the court struck down the city's ordinance. It found that the ordinance violated RLUIPA because nothing in the record explained how the excluded religious assemblies harmed the city's objectives more so than the included non-religious assemblies. *Id*. at 272.

The difference between both approaches likely compels a different result here. The Third Circuit's interpretation makes it difficult for the Church's claim to survive. The non-religious "assemblies" the Church identified (com-

mercial gymnasiums, health clubs, salons, day care centers, and hotels), assuming they are indeed assemblies, are all commercial entities that contribute to the business district in ways a church cannot. *Midrash*'s interpretation of the Equal Terms provision, adopted by the district court, significantly improves the Church's likelihood of success. It would only need to demonstrate that one of the permitted uses was an "assembly" to establish a RLUIPA violation, and, thus, require us to apply strict scrutiny. It is debatable whether a day care center, a hotel, or a gymnasium can be considered an assembly, but the Church would have at least some non-negligible chance to win on the merits. As a result, we must first determine whether the district court applied the correct standard in finding that the Church's RLUIPA claim had a slight likelihood of success. The important question here is the proper interpretation of "less than equal." The statute does not state explicitly whether this language means religious and non-religious institutions must always be treated *identically* in land-use regulations, or whether the regulations can differentiate between them for legitimate, non-religious reasons.

The Third and Eleventh Circuits are in agreement, and the legislative history suggests that RLUIPA codified in September 2000 the existing Free Exercise clause jurisprudence. *Lighthouse*, 510 F.3d at 264 (citing 146 Cong. Rec. S7774, 7776 (July 27, 2007) (Senate Sponsor's statement) ("Sections 2(b)(1) and (2) . . . enforce the Free Exercise Clause rule against laws that burden religion and are not neutral and generally applicable.")); *Midrash*, 366 F.3d at 1232. We find the Third Circuit's reasoning

persuasive because we believe it is more consistent with Congress's intent and with the case law interpreting the Free Exercise clause.

The Supreme Court has clearly stated that the right of free exercise of religion does not require us to invalidate neutral laws of general applicability. *Employment Div., Dept. of Human Res. of Or. v. Smith*, 494 U.S. 872, 879 (1990). Laws that depart from this principle of neutrality are subject to strict scrutiny. *Id*. There are two ways in which a law can discriminate against religious conduct. The first is facially. In *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, for instance, the Supreme Court stated that "[a] law lacks facial neutrality if it refers to a religious practice without a secular meaning discernible from the language *or* context." 508 U.S. 520, 533 (1993) (emphasis added). In that case, the challenged ordinances prohibited the "sacrifice" of animals within the city limits, but exempted "slaughtering" (defined as "the killing of animals for food") by " 'licensed establishment[s]' of animals 'specifically raised for food purposes.' " *Id*. at 536. The plaintiff argued that the words "sacrifice" and "ritual" had strong religious connotations and that the use of those terms in the ordinances demonstrated a lack of facial neutrality. *Id*. at 533-34. The Court disagreed, holding that "sacrifice" and "ritual" had secular meanings, and that the ordinance defined them without reference to religious practices. *Id*. at 534.

An ordinance also lacks neutrality if its object is to suppress religious practice. *Id*. at 534. The Court in *Lukumi* found persuasive the fact that the Santeria church's

rituals were "almost the only conduct subject to [the ordinances]," the stated government interests could have been addressed with narrower regulations, and that statements from city officials indicated hostility towards the religion. *Id*. at 535, 539. This led the Court to conclude that the object of the ordinances was to prohibit the church's religious practice. Since this demonstrated a lack of neutrality, the Court applied strict scrutiny before finding that the law violated the Free Exercise clause of the First Amendment. *Id*. at 546-47.

We assume that Congress, consistent with the Free Exercise cases, did not intend to invalidate neutral laws of general applicability. And the Supreme Court explained in *Lukumi*, that a law is non-neutral if it "refers to a religious practice *without a secular meaning discernible from the language or context*" or if its object was to suppress religious practice. *Lukumi*, 508 U.S. at 533-34 (emphasis added). So the question is whether an ordinance that permits some non-religious assemblies but excludes religious assemblies can be considered, without more, discriminatory or non-neutral. We agree with the Third Circuit in finding that it cannot.

The Eleventh Circuit's approach would find a zoning ordinance non-neutral and not of general applicability (and thus apply strict scrutiny), any time a church is precluded from locating in an area that permits non-religious assemblies. Adopting the Eleventh Circuit's definition of "assembly"—"a company of persons collected together in one place [usually] and usually for some common purpose (as deliberation and legislation, worship,

or social entertainment),” *Midrash*, 366 F.3d at 1230—
would significantly expand the scope of local ordinances
implicated under RLUIPA. There is no shortage of
hypotheticals demonstrating the dangers of such an
expansive reading of the Equal Terms provision. *See, e.g.*,
*Lighthouse*, 510 F.3d at 268 (“[I]f a town allows a local, ten-
member book club to meet in the senior center . . . , it must
permit a religious assembly with rituals involving the
sacrificial killings of animals or the participation of wild
bears [ ] to locate in the same neighborhood . . . .”); *Centro
Familiar Cristiano Buenas Nuevas v. City of Yuma*, 615
F. Supp. 2d 980, 994 (D. Ariz. 2009) (a zoning ordinance
that permits *only one* assembly but excludes all others
will violate RLUIPA unless it also permits *all* types of
religious assemblies). Indeed, the Eleventh Circuit recog-
nized that the “mention of church or synagogue,” or, in
this case, its omission from a list of permissible uses, “does
not destroy a zoning code’s neutrality.” *Midrash*, 366
F.3d at 1232-33 (citing *Walz v. Tax Comm’n of New York
City*, 397 U.S. 664 (1970) (Harlan, J., concurring)). That is
because a law that refers to a religious practice but has a
discernible secular meaning is not facially discriminatory
as we understand it in the Free Exercise context. *Lukumi*,
508 U.S. at 533-34. The same is true for zoning ordinances.
Land use regulations generally include or exclude a
number of entities. And the fact that a church is one of
them does not render the law facially discriminatory.
*See Civil Liberties for Urban Believers v. City of Chi.*, 342
F.3d 752, 763 (7th Cir. 2003) (finding an ordinance
facially neutral when the ordinance did not include a
church as a permitted use, but instead designated it a

special use requiring approval from the Zoning Board of Appeals). Furthermore, that a zoning ordinance permits a non-religious assembly but excludes a religious assembly does not indicate that its object was to target religious practice. There are a number of legitimate secular reasons for permitting some assemblies while excluding others, some of which are even stated in the ordinance themselves. The Eleventh Circuit's approach makes no inquiry into any of them before determining whether an ordinance violates RLUIPA. It presumes an illicit motive, and, as a result, it potentially subjects to strict scrutiny laws that may be considered neutral and generally applicable under our Free Exercise jurisprudence.

Comparing the effect of the included and excluded assemblies on the local government's stated goals before finding a RLUIPA violation presents a more workable standard. It allows the court to determine whether the ordinance targets religious assemblies for non-secular reasons or whether it is indeed neutral and generally applicable. We believe this interpretation, adopted by the Third Circuit, is more consistent with congressional intent, which was to codify the Free Exercise jurisprudence. Merely pointing to any differential treatment between both groups is not enough. That would only lead us to the conclusion that religious assemblies are automatically entitled to all benefits extended to the non-religious; we do not believe this is what the Supreme Court or Congress intended. *Cf. Grace United Methodist Church v. City of Cheyenne*, 451 F.3d 643, 651 (10th Cir. 2006) ("[W]e have already refused to interpret *Smith* as standing for the

proposition that a secular exemption automatically creates a claim for a religious exemption.").

The impact of the broad interpretation the Church urges us to adopt cannot be alleviated by applying strict scrutiny to RLUIPA violations. Although the Substantial Burden provision makes reference to strict scrutiny, the Equal Terms provision does not. For our purposes, Congress's silence is instructive. *See Russello v. United States*, 464 U.S. 16, 23 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion."). The strict scrutiny requirement is more than just a legal standard. If used as the Church suggests, it has the potential to significantly impede the ability of local governments to pass legislation that place incidental burdens on any religious practice. To the Supreme Court in *Smith*, requiring the government to demonstrate a compelling interest in all Free Exercise cases produced a "private right to ignore generally applicable laws," a "constitutional anomaly" which the Court found unacceptable. 494 U.S. at 886. If Congress meant to apply strict scrutiny to violations of the Equal Terms provision as well, it would have said so in the statute. Therefore, we also agree with the Third Circuit in finding that a violation of section (b), by itself, is sufficient to invalidate a land use regulation.

Applying this framework to the facts of this case, we see little similarity between the Church and the permitted or special uses in the B-2 district. The Church argues that it was unlawfully excluded from the district because the

Village still allowed other non-religious uses such as commercial gymnasiums, health clubs, salons, day care centers, and hotels. Assuming some of the permitted uses may be considered assemblies, their effect on the Village's goals are sufficiently distinguishable to remove any suspicion of religious gerrymandering. The Village sought to create a tax revenue-generating commercial district centered near the mass transit area. The permitted entities are all *commercial* in nature, while churches, meeting halls, community centers, and schools (which are all uses excluded from the ordinance after the amendment) are not. A locality seeking to create a commercial area should be able to exclude non-commercial uses that do not contribute to its goal without violating RLUIPA. As a result, the Church's likelihood of success on the merits is slight at best.

## B.  Church Will Suffer Irreparable Harm

Although the Church has a low probability of success in its RLUIPA claim, we recognize that "bright lines do not always mark the difference between no chance and slight chance." *See AM Gen. Corp. v. DaimlerChrysler Corp.*, 311 F.3d 796, 831 (7th Cir. 2002). The purpose of our analysis is to reduce the cost of error. *Id*. Assuming the Church's likelihood of success reaches the non-negligible threshold, we conclude that it would not be entitled to a preliminary injunction.

At stake in this appeal is the Church's ability to move forward with its plans to relocate to Hazel Crest, and to carry out its neighborhood redevelopment plans in the interim, while the case is pending in the district court. A

preliminary injunction would do just that. Of course, this means that the Village would be forced to grant a zoning exception to the Church, in a district reserved for commercial development. As a result, we address whether the Church will suffer irreparable harm if it is not allowed to relocate immediately, and, if so, whether it exceeds the harm an injunction would cause to the Village.

Irreparable harm is a type of injury that "cannot be repaired, retrieved, put down again, atoned for . . ." and is not compensable in monetary terms. *Graham v. Med. Mut. of Ohio*, 130 F.3d 293, 296 (7th Cir. 1997); *see also East St. Louis Laborers' Local 100 v. Bellon Wrecking & Salvage Co.*, 414 F.3d 700, 703-04 (7th Cir. 2005). In assessing the risk of irreparable harm, our focus is not simply what the Church will lose by an unfavorable ruling, but rather on the harm of error. In other words, assuming the Church ultimately wins this case on the merits and receives all the relief it seeks, "what irreparable harm would the denial of a preliminary injunction cause to the [Church]"? *DaimlerChrysler Corp.*, 311 F.3d at 831. This is just another way of asking: what is the harm in waiting for a final adjudication on the merits?

The Church believes that we should presume irreparable harm because it alleged a violation of RLUIPA, which protects the constitutional right of religious exercise in the land use context. We recognize that the loss of First Amendment rights constitutes irreparable harm. *Christian Legal Soc'y*, 453 F.3d at 867 (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). But the inter-

section between RLUIPA and the First Amendment is only partial, because RLUIPA *extends* the Free Exercise clause jurisprudence to the land use context. For instance, RLUIPA's Equal Terms provision applies to laws that do not necessarily impose a substantial burden on religious practices; but such laws do not violate the Free Exercise Clause of the First Amendment, even if they have incidental effects on a religion. *Lukumi*, 508 U.S. at 531-32; *see also Civil Liberties for Urban Believers*, 342 F.3d at 766 (holding that whatever obstacles the zoning ordinance presented to the church's ability to locate did not regulate or interfere with its ability to "adhere to the central tenets of [its members'] religious beliefs."). Since we cannot presume that RLUIPA and First Amendment violations are one and the same, a plaintiff alleging irreparable harm as a result of a RLUIPA violation must explain how the challenged law or regulation affects his religious exercise. For our purposes, the Church must explain how the inability to relocate to the Village's TIF District inhibits its religious exercise or otherwise creates irreparable harm. *See Lighthouse*, 510 F.3d 253, 274 (3d Cir. 2007).

Location, according to the Church, is critical to the success of its mission, and a zoning ordinance that prevents it from relocating to the blighted area of Hazel Crest Proper prevents it from carrying out its ministry effectively. The Church plans to "empower communities" and "transform economic conditions" using a grassroots approach that includes a women's ministry, literacy programs, assistance with small business ventures, and other forms of community revitalization. A location

where it can be a "focal point" and remain in close proximity to Hazel Crest's poorer communities and schools with low reading scores is instrumental to the Church's mission. To that end, we agree with the district court that the Church's inability to relocate can be considered irreparable harm. It limits the reach of its ministry, even if temporarily, and, by extension, inhibits its religious exercise. *See Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996) ("[I]t is the *alleged* violation of a constitutional right that triggers a finding of irreparable harm . . . although plaintiff's free exercise claim is statutory rather than constitutional, the denial of a plaintiff's right to the free exercise of his religious beliefs is a harm that cannot be adequately compensated monetarily.").

### C.  Church's Harm Does Not Outweigh Village's Harm

The next step in our analysis is to balance the potential harm to both parties. For this inquiry, we apply a "sliding scale" approach. The less likely a plaintiff is to win on the merits, the more heavily the balance of harm must weigh in his favor to warrant a preliminary injunction. *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S., Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008). Since we found the Church's likelihood of success to be slim at best, it must show that it will suffer irreparable harm that significantly outweighs the harm to the Village.

We agree with the district court that the potential harm to the Village's revitalization goals weighs heavily against granting the Church's request for injunctive relief. The subject property is located in an area slated for extensive

redevelopment. The Village planned to invest over $12 million dollars in public funds ($200,000 of which it has already spent) to improve infrastructure and the overall appearance of the area. Given the close proximity to the train station, the Village hoped to attract businesses to serve the "convenience, shopping, dining and service needs" of the residents and commuters—a transit-oriented commercial area. In return, the Village hoped to generate tax revenue that it could use to repay the municipality, as required by the TIF plan. The Church is correct in pointing out that the loss in revenue alone does not constitute irreparable harm, *see Graham*, 130 F.3d at 296, and, based on the record, we see little progress made in the redevelopment plan since it was instituted in January 2001. However, allowing the Church to relocate to the subject property, even temporarily, would result in land use that is incompatible with the Village's redevelopment plan. The plan relies primarily on its ability to attract private investment, and, as the district court noted, uncertainty over the Village's ability to enforce its zoning ordinance, or the future direction of the community, would likely compromise this goal in the future. "When you reach a certain critical mass of retail you get more retail." In other words, if a church can set up shop in the B-2 district, potential investors may have less confidence that the Village can turn the district into a "transit-oriented commercial area," or otherwise carry out its development goals. This presents a significant but unquantifiable threat to the Village's redevelopment plan.

Furthermore, we recognize that the purpose of the ordinance was to carry out a "traditional and long

accepted function of government": promoting economic development. *Kelo v. City of New London, Conn*, 545 U.S. 469, 484 (2005). The relief sought by the Church interferes with the Village's ability to carry out its traditional functions and enact measures that it believes are in its citizens' best interests. This is indeed another type of harm that must be taken into account when balancing hardships. *See Heideman v. South Salt Lake City*, 348 F.3d 1182, 1191 (10th Cir. 2003). Assuming the ordinance does not violate either RLUIPA or the Constitution (and it appears that it doesn't, based on our analysis in the previous section) the Village would be injured by postponing its enforcement. *See id*.

At this point, we do not need to pinpoint exactly where the balance of harm lies. Both parties have important interests at stake. The Hazel Crest Proper location is instrumental to the Church's mission, but the Church considered other locations and price was also an important factor in selecting the subject property. Similarly, an injunction that allows the Church to relocate may create further obstacles in the Village's attempts to attract private investment; yet before the most recent amendment, the Village was willing to allow a number of other non-commercial uses to locate in the B-2 district without concern for the long-term effects on its redevelopment plan. Without determining whether the district court abused its discretion, we can say, at the least, that the Church's harm does not significantly outweigh that of the Village. And, given the minimal prospects of success on the merits, we need not address the

other elements to conclude that the Church is not entitled to a preliminary injunction.

### III.  CONCLUSION

The judgment of the district court is AFFIRMED.