COLLOTON, Circuit Judge.
This appeal arises from an action filed by nine professional football players and one prospective football player (“the Players”) against the National Football League and its thirty-two separately-owned clubs, more commonly known as football teams (collectively, “the NFL” or “the League”). On March 11, 2011, a collective bargaining agreement between the League and a union representing professional football players expired. The League had made known that if a new agreement was not reached before the expiration date, then it would implement a lockout of players, during which the athletes would not be paid or permitted to use club facilities. The League viewed a lockout as a legitimate tactic under the labor laws to bring economic pressure to bear on the players as part of the bargaining process. See Am. Ship Bldg. Co. v. NLRB, 380 U.S. 300, 301-02, 318, 85 S.Ct. 955, 13 L.Ed.2d 855 (1965).
The players, aware of the League’s strategy, opted to terminate the union’s status as their collective bargaining agent as of 4:00 p.m. on March 11, just before the agreement expired. Later that day, the Players filed an action in the district court alleging that the lockout planned by the League would constitute a group boycott and price-fixing agreement that would violate § 1 of the Sherman Antitrust Act. The complaint explained that “the players in the NFL have determined that it is not in their interest to remain unionized if the existence of such a union would serve to allow the NFL to impose anticompetitive restrictions with impunity.” The plaintiffs also alleged other violations of the antitrust laws and state common law.
The League proceeded with its planned lockout on March 12, 2011. The Players moved for a preliminary injunction in the district court, urging the court to enjoin the lockout as an unlawful group boycott that was causing irreparable harm to the Players. The district court granted a preliminary injunction, and the League appealed. We conclude that the injunction did not conform to the provisions of the Norris-LaGuardia Act, 29 U.S.C. § 101 et seq., and we therefore vacate the district court’s order.
I.
A.
Some historical background will place this case in context. In Radovich v. NFL, 352 U.S. 445, 451-52, 77 S.Ct. 390, 1 L.Ed.2d 456 (1957), the Supreme Court held that professional football — unlike major league baseball — -is not categorically exempt from the antitrust laws. In 1968, the National Labor Relations Board (“NLRB”) recognized the NFL Players Association (“NFLPA”) as the exclusive bargaining representative of all NFL play *664 ers, and the NFL and the NFLPA entered into their first collective bargaining agreement (“CBA”). Mackey v. NFL, 543 F.2d 606, 610 (8th Cir.1976). Since then, the relationship between the League and its players has been punctuated by both collective bargaining agreements and antitrust lawsuits.
In 1972, several players filed an antitrust action against the League in Mackey v. NFL, alleging that the League’s policy with respect to free agents — that is, players whose contracts with a particular team have expired — violated § 1 of the Sherman Act, 15 U.S.C. § 1.[1] Mackey, 543 F.2d at 609. This court concluded that the restriction at issue, known as the “Rozelle Rule,” unreasonably restrained trade in violation of § 1, because it was “significantly more restrictive than necessary to serve any legitimate purposes” of maintaining competitive balance in the NFL. Id. at 622. While the Mackey litigation was pending, the CBA between the League and the NFLPA expired, and seventy-eight NFL players filed a separate class action antitrust suit against the League. See Reynolds v. NFL, 584 F.2d 280, 282 (8th Cir.1978); Alexander v. NFL, No. 4-76-123, 1977 WL 1497, at *1 (D.Minn. Aug. 1, 1977). In 1977, the League and the players entered into a settlement agreement incorporating a new CBA that implemented a revised system of free agency known as “right of first refusal/compensation.” Alexander, 1977 WL 1497, at *1-2. As part of the settlement, the League withdrew its petition for a writ of certiorari in Mackey. Reynolds, 584 F.2d at 282.
This state of affairs lasted until December 1982, when the NFL players engaged in a fifty-seven-day strike before agreeing to a new CBA that included a modified version of the “right of first refusal/compensation” system. Powell v. NFL, 930 F.2d 1293, 1295-96 (8th Cir.1989); Powell v. NFL, 678 F.Supp. 777, 780-81 (D.Minn.1988), rev’d, 930 F.2d 1293. This CBA expired in 1987, and when negotiations for a new CBA proved unsuccessful, the NFLPA conducted another strike. Powell, 930 F.2d at 1296. Immediately after the strike ended in October 1987, the NFLPA and several individual • players commenced an antitrust suit in Powell v. NFL, alleging among other things that the League’s free agency restrictions violated the Sherman Act. Id. This court held that a nonstatutory labor exemption from the antitrust laws shielded the League from antitrust liability. Id. at 1303. The Supreme Court “has implied this exemption from federal labor statutes,” reasoning that “to give effect to federal labor laws and policies and to allow meaningful collective bargaining to take place, some restraints on competition imposed through the bargaining process must be shielded from antitrust sanctions.” Brown v. Pro Football, Inc., 518 U.S. 231, 236-37, 116 S.Ct. 2116, 135 L.Ed.2d 521 (1996). This court in Powell concluded that the nonstatutory labor exemption can extend beyond an impasse in negotiations, and that application of the exemption was appropriate in that case, because the parties still could resolve their differences through the use of the “offsetting tools” of labor law, including strikes, lockouts, and petitions for intervention by the NLRB. 930 F.2d at 1302-03. The court declined, however, “to look into the future and pick a termination point for the labor exemption.” Id. at 1303.
Two days after this court’s decision in Powell, on November 3, 1989, the NFLPA’s executive committee decided to *665 abandon the organization’s collective bargaining rights in an effort to end the NFL’s nonstatutory labor exemption from the antitrust laws. Powell v. NFL, 764 F.Supp. 1351, 1354 (D.Minn.1991). The NFLPA disclaimed its union status, enacted new bylaws prohibiting it from engaging in collective bargaining with the League, filed a labor organization termination notice with the U.S. Department of Labor, obtained a reclassification by the Internal Revenue Service as a “business league” rather than a labor organization, and notified the NFL that it would no longer represent players in grievance proceedings. Id.
In 1990, eight individual football players brought a new antitrust action against the League in McNeil v. NFL, contending that new player restraints imposed by the League during the 1990-1991 season violated § 1 of the Sherman Act. Id. at 1359. Following a ten-week trial in late 1992, a jury rendered a verdict in favor of the McNeil plaintiffs and awarded substantial damages. See McNeil v. NFL, No. 4-90-476, 1992 WL 315292, at *1 (D.Minn. Sept. 10, 1992).
Two new antitrust lawsuits were filed in the two-week period after the McNeil verdict. Ten NFL players brought suit in Jackson v. NFL, alleging that the League’s free agency restrictions violated the Sherman Act. Jackson v. NFL, 802 F.Supp. 226, 228-229, 234 n. 14 (D.Minn.1992). Five other NFL players instituted White v. NFL, a class action alleging that various practices of the League, including free agency restraints, the college draft, and the use of a standard NFL player contract, violated the antitrust laws. See White v. NFL, 822 F.Supp. 1389, 1395 (D.Minn.1993).
Many disputes between the League and the players were resolved when the parties entered into a class action settlement agreement in White. In January 1993, the parties reached a tentative agreement designed to resolve WMfe and related cases. Id. at 1395-96. The NFLPA subsequently collected authorization cards from NFL players re-designating the organization as the players’ exclusive collective bargaining representative, and the NFL voluntarily recognized the NFLPA as the players’ union on March 29, 1993. Id. at 1396-97. The district court approved the parties’ Stipulation and Settlement Agreement (“SSA”) in April 1993, and the NFL and the NFLPA entered into a new CBA shortly thereafter. White v. NFL, 836 F.Supp. 1458,1465-66 (D.Minn.1993). The NFL and the NFLPA agreed to amend various portions of the SSA to conform to the provisions of the new CBA, and the district court approved the requested amendments. Id. at 1466, 1468. The court entered a consent decree incorporating the terms of the amended SSA on August 20, 1993. White v. NFL, 836 F.Supp. 1508, 1511 (D.Minn.1993).
In 1996, the Supreme Court decided an important case concerning professional football and the scope of .the nonstatutory labor exemption from the antitrust laws, Brown v. Pro Football, Inc., 518 U.S. 231, 116 S.Ct. 2116. After the expiration of the collective bargaining agreement in 1987, the League and the NFLPA bargained to impasse over player salaries for members of each club’s “developmental squad,” which consisted of up to six first-year play-, ers who were not on the regular player roster. The League then unilaterally implemented an agreement among the clubs to pay a salary of $1000 per week to these players. A group of the players sued, alleging that the employers’ agreement violated § 1 of the Sherman Act. The Supreme Court held that the nonstatutory labor exemption applied to the employer conduct at issue, which (1) took place during and immediately after a collective-bargaining negotiation, (2) grew out of, and *666 was directly related to, the lawful operation of the bargaining process, (3) involved a matter that the parties were required to negotiate collectively, and (4) concerned only the parties to the collective-bargaining relationship. Id. at 250, 116 S.Ct. 2116. In a closing paragraph, the Court added the following:
Our holding is not intended to insulate from antitrust review every joint imposition of terms by employers, for an agreement among employers could be sufficiently distant in time and in circumstances from the collective-bargaining process that a rule permitting antitrust intervention would not significantly interfere with that process. See, e.g., 50 F.3d, at 1057 (suggesting that exemption lasts until collapse of the collective-bargaining relationship, as evidenced by decertification of the union); El Cerrito Mill & Lumber Co., 316 N.L.R.B. [1005], at 1006-1007 [ (1995) ] (suggesting that “extremely long” impasse, accompanied by “instability” or “defunctness” of multiemployer unit, might justify union withdrawal from group bargaining). We need not decide in this case whether, or where, within these extreme boundaries to draw that line. Nor would it be appropriate for us to do so without the detailed views of the Board, to whose “specialized judgment” Congress “intended to leave” many of the “inevitable questions concerning multiemployer bargaining bound to arise in the future.”
Id. (citations omitted).
The Supreme Court’s most recent decision regarding this industry came in American Needle, Inc. v. NFL, — U.S. -, 130 S.Ct. 2201, 176 L.Ed.2d 947 (2010). The Court held that the alleged conduct of the NFL teams in forming National Football League Properties to develop, license, and market their individually owned intellectual property, and then to grant an exclusive license for that property, was concerted action not categorically beyond the coverage of § 1 of the Sherman Act. At the same time, the Court remarked that “[flootball teams that need to cooperate are not trapped by antitrust law,” to wit: “The fact that NFL teams share an interest in making the entire league successful and profitable, and that they must cooperate in the production and scheduling of games, provides a perfectly sensible justification for making a host of collective decisions.” Id. at 2216. Yet these interests did not justify treating the NFL teams as a single entity for purposes of § 1 of the Sherman Act when it came to the marketing of their intellectual property. Id. at 2217.
B.
Since 1993, the players and the League have operated under the White SSA, and the district court has continued to oversee the settlement by resolving numerous disputes over the terms of the SSA and CBA. White v. NFL, 585 F.3d 1129, 1133 (8th Cir.2009). Whenever the NFL and the NFLPA have agreed to change a provision in the CBA, a conforming change has also been made to the SSA. Id. at 1134. The SSA has been amended several times over the past eighteen years, most recently in 2006, when the NFL and the NFLPA reached an agreement on a new CBA that would last through the 2012-2013 football season. See id. The 2006 SSA and CBA gave both sides the right to opt out of the final two years of each agreement upon written notice.
In May 2008, the NFL opted out of the final two years of the SSA and CBA, citing concerns about operating costs and other elements of the agreements. White v. NFL, 766 F.Supp.2d 941, 944-45 (D.Minn.2011). As a result, the SSA and CBA were scheduled to expire in early March 2011. Id. Although the NFL and the NFLPA engaged in more than two years *667 of negotiations toward a new CBA, the League and the players were unable to reach an agreement. The League filed an unfair labor practice charge with the NLRB in February 2011, asserting that the union failed to confer in good faith. The Players say that the charge is merit-less.
As the deadline approached, a substantial majority of NFL players voted to end the NFLPA’s status as their collective bargaining representative. On March 11, 2011 — the expiration date of the SSA and CBA — the NFLPA notified the NFL that it disclaimed interest in continuing to serve as the players’ collective bargaining representative, effective at 4:00 p.m. The NFLPA also amended its bylaws to prohibit collective bargaining with the League or its agents, filed a labor organization termination notice with the Department of Labor, asked the Internal Revenue Service to reclassify the NFLPA as a professional association rather than a labor organization, and notified the NFL that it would no longer represent players bringing grievances against the League.
The League filed an amended unfair labor practice charge on March 11, alleging that the NFLPA’s disclaimer was a “sham” and that the combination of a disclaimer by the union and subsequent antitrust litigation was “a ploy and an unlawful subversion of the collective bargaining process.” The Players dispute the charge, citing an advice memorandum of an associate general counsel of the NLRB in Pittsburgh Steelers, Inc., No. 6-CA-23143, 1991 WL 144468 (NLRB G.C. June 26, 1991). The memorandum concluded that the NFLPA’s 1989 disclaimer was valid, and that it was “irrelevant” whether the disclaimer was motivated by “litigation strategy,” so long as the disclaimer was “otherwise unequivocal and adhered to.” Id. at *2 & n. 8.
The Players, funded by the NFLPA, commenced this action on the same day as the disclaimer, March 11, 2011. Four of the plaintiffs are under contract with an NFL club; five are free agents, and one is a prospective player who had entered the 2011 NFL draft and was ultimately selected in that draft. The Players brought this action on behalf of themselves and a putative class consisting of players who are under contract with any NFL club, free agents seeking employment with any NFL club, and college or other players who have not previously been under contract with any NFL club and who are eligible to play as a rookies for any club. As the case comes to us, no class has been certified.
The Players explained in their complaint that “[t]he players ... have ended the role of the NFLPA as their collective bargaining representative and no longer have a collective bargaining relationship with the NFL defendants.” They asserted, based on the Supreme Court’s language in Brown, that the nonstatutory labor exemption therefore no longer protects the League from antitrust liability. The complaint alleged that the NFL’s planned lockout was an illegal group boycott and price-fixing arrangement that violated § 1 of the Sherman Act. In addition, the Players claimed that the lockout would violate state contract law by depriving players of contractually owed compensation, and would violate state tort law by interfering with players’ existing contracts as well as their opportunities to enter into new contracts with NFL teams.
The complaint further alleged that the League planned to institute or to continue several anticompetitive practices that would violate § 1 of the Sherman Act, including a limitation on the amount of compensation that can be paid to recently drafted first-year “rookie” players, a cap on salaries for current players, and “fian *668 chise player” and “transition player” designations that restrict the ability of free agents to join a team other than their former team. The Players requested damages and declaratory and injunctive relief regarding these practices, including an injunction prohibiting the League from implementing or continuing the lockout.[2]
The SSA and CBA expired at 11:59 p.m. on March 11. At 12:00 a.m. on March 12, the League instituted a lockout of members of the NFLPA’s “bargaining unit,” which includes professional football players under contract, free agents, and prospective players who have been drafted by or entered into negotiations with an NFL team. The NFL informed players under contract that the lockout would prohibit them from entering League facilities, from receiving any compensation or benefits, and from performing any employment duties including playing, practicing, working out, attending meetings, making promotional appearances, and consulting medical and training personnel except in limited situations. The League also notified the players that they could be required to report back to work immediately “[o]nce a new labor agreement is reached” between the NFL and the NFLPA.
On April 25, 2011, the district court granted the Players’ motion to enjoin the lockout, rejecting the League’s assertions that the court lacked jurisdiction to enter the injunction, that the court should defer to the primary jurisdiction of the NLRB, and that the League is in any event immune from antitrust liability under the nonstatutory labor exemption. See Brady v. NFL, 779 F.Supp.2d 992, 1042-43, No. 11-639, 2011 WL 1535240, at *37 (D.Minn. Apr. 25, 2011) [hereinafter Brady I.]. The court concluded that the Noms-LaGuardia Act (“NLGA” or “Act”), 29 U.S.C. § 101 et seq., which restricts the power of federal courts to issue injunctions in cases “involving or growing out of a labor dispute,” id. § 1, was inapplicable, because the term “labor dispute” connotes a dispute between an employer and a union, and the Act therefore does not apply “absent the present existence of a union.” Brady I, 779 F.Supp.2d at 1026-32, 2011 WL 1535240, at *24-26. In the court’s view, the conflict between the League and the players ceased to be a “labor dispute” subject to the Act when the NFLPA terminated its status as a union by disclaiming its role as the players’ collective bargaining representative. Id. at 1031-33, 2011 WL 1535240 at *26-27.
The district court also declined to stay the action pending the NLRB’s resolution of the League’s pending unfair labor practice charges. See id. at 1006-07, 2011 WL 1535240 at *9. The court determined that a stay would not be appropriate because the delay could cause significant hardship for the plaintiffs, and because “[t]he Board has articulated the standard under which disclaimers must be evaluated in a clear and consistent fashion, and application of that established standard requires no particular specialized expertise.” Id. at 1013-15, 1018-19, 2011 WL 1535240 at *14-15, 18. Finally, the district court concluded that the nonstatutory labor exemption does not protect the League from antitrust liability related to the lockout. See id. at 1039-40, 2011 WL 1535240 at *34. In the court’s view, the exemption applies only to agreements concerning “mandatory subjects of collective bargaining,” such as wages, hours, and other terms and conditions of employment, and an employer’s *669 imposition of a lockout is not exempted because “[a] lockout is not a substantive term or condition of employment.” Id. at 1040-42, 2011 WL 1535240 at *35-36. The court distinguished the Supreme Court’s decision in Brown on the basis that the parties here “have left the collective bargaining framework entirely.” Id. at 1040-41, 2011 WL 1535240 at *35.
The district court’s order stated only that “[t]he ‘lockout’ is enjoined,” id. at 1042-43, 2011 WL 1535240 at *37, and did not expressly define the scope of the injunction. In concluding that the plaintiffs would suffer irreparable harm absent an injunction, however, the court indicated that its order would prevent the harm that players would suffer if the League were able to bar them from playing or practicing for an extended period of time. See id. at 1035-36, 2011 WL 1535240 at *29-30. The court also suggested that the injunction would provide free agents and rookies with significant opportunities to market their services to individual teams, see id. at 1036-38, 2011 WL 1535240 at *31-32, although it later remarked in denying a motion for stay pending appeal that the injunction did not require the League to enter into contracts. See Brady v. NFL, 779 F.Supp.2d 1043, 1049-50, No. 11-639, 2011 WL 1578580, at *5 (D.Minn. Apr. 27, 2011). From this discussion, we understand the court’s order to mean that the League must allow players under contract to play football, attend practice sessions, and collect compensation, and that the League must provide free agents and rookies with an opportunity to market their services to potential employers.
The League appealed, challenging the district court’s application of the NorrisLaGuardia Act, the doctrine of primary jurisdiction, and the nonstatutory labor exemption. This court granted the NFL’s motion to expedite the appeal and its motion for a stay of the district court’s order pending appeal. We now consider the merits of the appeal.
II.
We consider first the League’s contention that the Norris-LaGuardia Act deprived the district court of jurisdiction to enter the injunction. The NLGA, enacted in 1932, curtails the authority of a district court to issue injunctions in a labor dispute. “Congress was intent upon taking the federal courts out of the labor injunction business except in the very limited circumstances left open for federal jurisdiction under the Norris-LaGuardia Act.” Marine Cooks & Stewards v. Pan. S.S. Co., 362 U.S. 365, 369, 80 S.Ct. 779, 4 L.Ed.2d 797 (1960).
The Supreme Court has explained that the NLGA responded directly to the Court’s construction of § 20 of the Clayton Act of 1914, 29 U.S.C. § 52, in Duplex Printing Press Co. v. Deering, 254 U.S. 443, 41 S.Ct. 172, 65 L.Ed. 349 (1921), and to other decisions of federal courts entering or upholding injunctions in labor disputes. Burlington N. R.R. Co. v. Bhd. of Maint. of Way Emps., 481 U.S. 429, 438, 107 S.Ct. 1841, 95 L.Ed.2d 381 (1987). The Clayton Act bars federal courts, “in any case between an employer and employees, or between employers and employees, or between employees, or between persons employed and persons seeking employment, involving, or growing out of, a dispute concerning terms or conditions of employment,” from issuing an injunction to prohibit “any person or persons” from “ceasing to perform any work or labor” or “terminating any relation of employment.” 29 U.S.C. § 52. In Duplex Printing, however, the Court held that § 20 of the Clayton Act did not prohibit an injunction against a secondary boycott undertaken by union members who were not “proximately and substantively concerned as parties to *670 an actual dispute respecting the terms or conditions of their own employment.” 254 U.S. at 472, 41 S.Ct. 172. Similarly, in Bedford Cut Stone Co. v. Journeyman Stone Cutters’ Ass’n, 274 U.S. 37, 47 S.Ct. 522, 71 L.Ed. 916 (1927), the Court ruled that § 20 did not prohibit an injunction against a union’s refusal to perform work on stone produced by a particular company with which the union had an ongoing dispute. Id. at 42-43, 55, 47 S.Ct. 522. The NLGA effectively superseded these decisions by precluding federal courts from enjoining certain secondary activity by workers in labor disputes.
The language of the Act, however, extends well beyond the specific issues decided in such cases as Duplex Printing and Bedford Cut Stone. The impetus for the NLGA was dissatisfaction with injunctions entered against workers in labor disputes, but the statute also requires that an injunction against an employer participating in a labor dispute must conform to the Act. E. g., Bodecker v. Local Union No. P-46, 640 F.2d 182, 185 (8th Cir.1981); District 29, United Mine Workers v. New Beckley Mining Corp., 895 F.2d 942, 944-47 (4th Cir.1990); Amalgamated Transit Union, Div. 1384 v. Greyhound Lines, Inc., 550 F. 2d 1237, 1238 (9th Cir.1977); Detroit Newspaper Publishers Ass’n v. Detroit Typographical Union No. 18, 471 F.2d 872, 876-77 (6th Cir.1972); see Greyhound Lines, Inc. v. Amalgamated Transit Union, Div. 1384, 429 U.S. 807, 97 S.Ct. 43, 50 L.Ed.2d 68 (1976). This case requires us to decide whether, and if so how, the Act applies to the district court’s injunction against the League.
To determine whether the NLGA forbids or places conditions on the issuance of an injunction here, we begin with the text of the statute. Section 1 provides that “[n]o court of the United States ... shall have jurisdiction to issue any ... temporary or permanent injunction in a case involving or growing out of a labor dispute, except in strict conformity with the provisions of this chapter.” 29 U.S.C. § 101. As noted, the district court concluded that the Act is inapplicable to this action, because the case is not one “involving or growing out of a labor dispute.”
Section 13(c) of the Act states that “[t]he term ‘labor dispute’ includes any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether or not the disputants stand in the proximate relation of employer and employee.” 29 U.S.C. § 113(c) (emphasis added). This lawsuit is a controversy concerning terms or conditions of employment. The Players seek broad relief that would affect the terms or conditions of employment for the entire industry of professional football. In particular, they urge the court to declare unlawful and to enjoin several features of the relationship between the League and the players, including the limit on compensation that can be paid to rookies, the salary cap, the “franchise player” designation, and the “transition player” designation, all of which the Players assert are anticompetitive restrictions that violate § 1 of the Sherman Act. The district court did not appear to question this point, even distinguishing authority cited by the Players on the ground that it involved a dispute over the sale of commodities rather than “a controversy over terms and conditions of employment.” Brady I, 779 F.Supp.2d at 1028 n. 44, 2011 WL 1535240, at *24 n. 44.
We are not convinced by the Players’ contention that because § 13(c) uses the term “includes,” rather than “means,” to introduce the substance of a “labor dispute,” Congress did not fully define the term. They urge that § 13(c) merely ex *671 panded in one respect (to disputes outside the employer-employee relationship) a preexisting definition of “labor dispute” — a definition that was not codified and that, according to the Players, extended only to disputes involving organized labor. Whatever might be the significance of the verb “include” when used in other contexts, cf. Massachusetts v. EPA, 549 U.S. 497, 556-58, 127 S.Ct. 1438, 167 L.Ed.2d 248 (2007) (Scalia, J., dissenting), Congress stated in § 13 of the NLGA that “labor dispute” is “defined in this section,” 29 U.S.C. § 113(a), and the Supreme Court consistently has described § 13(c) as a “definition” of “labor dispute.” Burlington N. R.R. Co., 481 U.S. at 443, 107 S.Ct. 1841; Jacksonville Bulk Terminals, Inc. v. Int’l Longshoremen’s Ass’n, 457 U.S. 702, 711 n. 11, 712, 102 S.Ct. 2672, 73 L.Ed.2d 327 (1982); H.A. Artists & Assocs. v. Actors’ Equity Ass’n, 451 U.S. 704, 714 n. 14, 715, 101 S.Ct. 2102, 68 L.Ed.2d 558 (1981); Order of R.R. Telegraphers v. Chi. & N.W. Ry. Co., 362 U.S. 330, 335, 80 S.Ct. 761, 4 L.Ed.2d 774 (1960); see also Bodecker, 640 F.2d at 185. Not only has the Supreme Court repeatedly characterized § 13(c) as a definition, but contrary to the suggestion that an established meaning should be used to narrow the text, the Court has observed that “the statutory definition itself is extremely broad,” Jacksonville Bulk Terminals, Inc., 457 U.S. at 712, 102 S.Ct. 2672, and explained that “Congress made the definition broad because it wanted it to be broad.” Order of R.R. Telegraphers, 362 U.S. at 335-36, 80 S.Ct. 761.
The Act also states expressly that “[a] case shall be held to involve or grow out of a labor dispute when the case involves persons who are engaged in the same industry, trade, craft, or occupation.” 29 U.S.C. § 113(a). This case, of course, involves persons engaged in the “same industry,” namely, professional football. The statute continues that such a case “shall be held to involve or grow out of a labor dispute” when “such dispute is ... between one or more employers or associations of employers and one or more employees or associations of employees.” Id. This dispute is between one or more employers or associations of employers (the League and the NFL teams) and one or more employees (the Players under contract). By the plain terms of the Act, this case “shall be held to involve or grow out of a labor dispute.”
The district court reached a contrary conclusion by departing from the text of § 13(a). The court thought the phrase “one or more employees or associations of employees” did not encompass the Players in this dispute, because “one or more employees” means “individual unionized employee or employees.” Brady I, 779 F.Supp.2d at 1027 n. 43, 2011 WL 1535240, at *24 n. 43 (emphasis added). We see no warrant for adding a requirement of unionization to the text.
A similar argument did not persuade the Supreme Court in New Negro Alliance v. Sanitary Grocery Co., 303 U.S. 552, 58 S.Ct. 703, 82 L.Ed. 1012 (1938). There, a company sought an injunction against the New Negro Alliance, which the Supreme Court described as “a corporation composed of colored persons, organized for the mutual improvement of its members and the promotion of civic, educational, benevolent, and charitable enterprises.” Id. at 555, 58 S.Ct. 703. The Alliance allegedly had conspired to picket and boycott one of the company’s grocery stores to pressure the store to employ African-American clerks. Id. at 555-56, 58 S.Ct. 703. The company claimed, among other things, that the Alliance’s acts were “unlawful, [and] constituted a conspiracy in restraint of trade.” Id. at 558-59, 58 S.Ct. 703. The district court granted an injunction against the Alliance. The court of appeals affirmed, reasoning in part as follows:
*672 “The controversy here is not a labor dispute. The defendants do not constitute a labor union or a labor organization of any kind. They do not compose, nor are they all members, of any single trade or class of trades. Their demands are not connected with any one industry. The questions about which they are now picketing have no connection with wages, hours of labor, unionization, or betterment of working conditions.... It is solely a racial dispute.”
New Negro Alliance v. Sanitary Grocery Co. 92 F.2d 510, 512-13 (D.C.Cir.1937) (quoting A.S. Beck Shoe Corp. v. Johnson, 153 Misc. 363, 274 N.Y.S. 946, 953 (N.Y.Sup.Ct.1934)).
The Supreme Court reversed. Although no labor organization was involved in the dispute, and the company argued that “a recognized labor union or unions or individual members thereof were involved” in all but one of the “labor dispute” precedents cited by the Alliance, Brief for Respondent at 24, New Negro Alliance, 303 U.S. 552, 58 S.Ct. 703, the Court ruled that the definitions in the Act “plainly embrace the controversy which gave rise to the instant suit and classify it as one arising out of a dispute defined as a labor dispute.” New Negro Alliance, 303 U.S. at 560, 58 S.Ct. 703. The Court observed that § 13(a) provides that a ease shall be held to involve or grow out of a labor dispute “when the case involves any conflicting or competing interests in a ‘labor dispute’ ... of ‘persons participating or interested’ therein,” and ruled that the Alliance and its individual members were “persons interested in the dispute.” Id. (internal quotation omitted). If § 13(a) were limited to controversies involving unions or unionized employees, then the Court could not have reached this conclusion.
Further confirmation that the present existence of a union is not required for a “labor dispute” comes from NLRB v. Washington Aluminum Co., 370 U.S. 9, 82 S.Ct. 1099, 8 L.Ed.2d 298 (1962). There, a group of seven employees who were “wholly unorganized” and had “no bargaining representative” or “representative of any kind to present their grievances to their employer” staged a walkout to protest cold working conditions in a machine shop. Id. at 14-15, 82 S.Ct. 1099. Although the employees were not part of a union, the Supreme Court held that the walkout “did grow out of a ‘labor dispute’ within the plain meaning of the definition of that term in § 2(9) of the [National Labor Relations] Act.” Id. at 15, 82 S.Ct. 1099. The definition of “labor dispute” in the National Labor Relations Act is “virtually identical” to the definition of “labor dispute” in the NLGA, and the two provisions “have been construed consistently with one another” by the Supreme Court. Jacksonville Bulk Terminals, Inc., 457 U.S. at 711 n. 11, 102 S.Ct. 2672; accord United States v. Hutcheson, 312 U.S. 219, 234 n. 4, 61 S.Ct. 463, 85 L.Ed. 788 (1941).
Even § 2 of the NLGA, cited by the Players as an interpretive guide for the Act based on its declaration of “[p]ublic policy in labor matters,” conflicts with the district court’s conclusion. Section 2 declares, among other things, that the “individual unorganized worker” shall be free from the interference of employers in “the designation of ... representatives or in self-organization or in other concerted activities for the purpose of collective bargaining or other mutual aid or protection.” 29 U.S.C. § 102 (emphasis added). Employees may engage in activities for the purpose of “mutual aid or protection” without the present existence of a union. Wash. Aluminum, 370 U.S. at 14-15, 82 S.Ct. 1099; First Nat’l Bank of Omaha v. NLRB, 413 F.2d 921, 926 (8th Cir.1969); Vic Tanny Int’l, Inc. v. NLRB, 622 F.2d 237, 241 (6th Cir.1980); NLRB v. Phoenix *673 Mut. Life Ins. Co., 167 F.2d 983, 988 (7th Cir.1948); see Wilson Trophy Co. v. NLRB, 989 F.2d 1502, 1508 (8th Cir.1993).
The Players, citing Ozark Air Lines, Inc. v. National Mediation Board, 797 F.2d 557 (8th Cir.1986), argue that circuit precedent requires “concerted labor activity” by “collectively organized employees” to establish a labor dispute under the Act. Appellees’ Br. 12. Ozark Air Lines did not so hold. That case involved an employee’s disability retirement claim arising under the Railway Labor Act, which includes specific provisions that take precedence over the more general provisions of the NLGA. 797 F.2d at 559, 563. This court also said the case had “nothing to do with terms and conditions of employment.” Id. at 563.
The definitions in the NLGA provide that a case shall be held to involve or grow out of a labor dispute if a controversy over terms and conditions of employment is between an employer and “one or more employees.” 29 U.S.C. § 113(a) (emphasis added). The Act’s reference to “concerted activities” appears only in the public policy section, 29 U.S.C. § 102. If the NLGA nonetheless were construed to require concerted activity by employees to establish a labor dispute, a lawsuit filed in good faith by a group of employees to achieve more favorable terms or conditions of employment is “concerted activity” under § 7 of the National Labor Relations Act. Mohave Elec. Co-op., Inc. v. NLRB, 206 F.3d 1183, 1189 & n. 8 (D.C.Cir.2000); Altex Ready Mixed Concrete Corp. v. NLRB, 542 F.2d 295, 297 (5th Cir.1976); Leviton Mfg. Co. v. NLRB, 486 F.2d 686, 689 (1st Cir.1973); see Eastex, Inc. v. NLRB, 437 U.S. 556, 565-66 & n. 15, 98 S.Ct. 2505, 57 L.Ed.2d 428 (1978).
The text of the Norris-LaGuardia Act and the cases interpreting the term “labor dispute” do not require the present existence of a union to establish a labor dispute. Whatever the precise limits of the phrase “involving or growing out of a labor dispute,” this case does not press the outer boundary. The League and the players’ union were parties to a collective bargaining agreement for almost eighteen years prior to March 2011. They were engaged in collective bargaining over terms and conditions of employment for approximately two years through March 11, 2011. At that point, the parties were involved in a classic “labor dispute” by the Players’ own definition. Then, on a single day, just hours before the CBA’s expiration, the union discontinued collective bargaining and disclaimed its status, and the Players filed this action seeking relief concerning industry-wide terms and conditions of employment. Whatever the effect of the union’s disclaimer on the League’s immunity from antitrust liability, the labor dispute did not suddenly disappear just because the Players elected to pursue the dispute through antitrust litigation rather than collective bargaining.
III.
The Players argue alternatively that even if this case does involve or grow out of a labor dispute, the district court’s injunction conforms to the provisions of the NLGA, and should be affirmed on this alternative ground. The League counters that § 4 of the Act includes a flat prohibition on injunctions against a lockout, and, alternatively, that even if the court has authority to enjoin a lockout under certain circumstances, the district court did not comply with the procedural requirements set forth in § 7 of the Act.
A.
Section 4 of the NLGA, 29 U.S.C. § 104, is entitled, “Enumeration of specific acts not subject to restraining orders or injunctions.” It provides:
*674 No court of the United States shall have jurisdiction to issue any restraining order or temporary or permanent injunction in any case involving or growing out of any labor dispute to prohibit any person or persons participating or interested in such dispute ... from doing, whether singly or in concert, any of the following acts:
(a) Ceasing or refusing to perform any work or to remain in any relation of employment;
(b) Becoming or remaining a member of any labor organization or of any employer organization, regardless of any such undertaking or promise as is described in section 103 of this title;
(c) Paying or giving to, or withholding from, any person participating or interested in such labor dispute, any strike or unemployment benefits or insurance, or other moneys or things of value;
(d) By all lawful means aiding any person participating or interested in any labor dispute who is being proceeded against in, or is prosecuting, any action or suit in any court of the United States or of any State;
(e) Giving publicity to the existence of, or the facts involved in, any labor dispute, whether by advertising, speaking, patrolling, or by any other method not involving fraud or violence;
(f) Assembling peaceably to act or to organize to act in promotion of their interests in a labor dispute;
(g) Advising or notifying any person of an intention to do any of the acts heretofore specified;
(h) Agreeing with other persons to do or not to do any of the acts heretofore specified; and
(i) Advising, urging, or otherwise causing or inducing without fraud or violence the acts heretofore specified, regardless of any such undertaking or promise as is described in section 103 of this title.
The League relies on § 4(a). It argues that this subsection forbids an injunction to prohibit a lockout. There is no uniform definition of the term “lockout,” but one “practical definition” used by this court is “a refusal by [an employer] to furnish available work to its regular employees.” Laclede Gas Co. v. NLRB, 421 F.2d 610, 615 & n. 9 (8th Cir.1970); see also 2 The Developing Labor Law 1639-40 (John E. Higgins, Jr. et al. eds., 5th ed. 2006) (“As used by the Board and the courts, ... a lockout is most simply and completely defined as the withholding of employment by an employer from its employees for the purpose of either resisting their demands or gaining a concession from them.”). The League maintains that by locking out all professional football players, it is “[r]efusing to ... remain in any relation of employment,” and is thus doing one of the acts that cannot be enjoined according to § 4. Because § 5 of the Act states that a district court cannot issue an injunction on the ground that parties to a labor dispute are violating the antitrust laws by doing in concert the acts enumerated in § 4, the League contends that § 5 is a further barrier to the district court enjoining the lockout.[3]
The Players respond that § 4(a) does not apply to employer injunctions at all. They cite the First Circuit’s decision in de Arroyo v. Sindicato de Trabajadores Packinghouse, 425 F.2d 281 (1st Cir.1970), *675 which was followed by the Ninth Circuit in Local 2750, Lumber & Sawmill Workers Union v. Cole, 663 F.2d 983 (9th Cir.1981). These cases involved injunctions issued in a different context — actions under § 301 of the Labor Management Relations Act, 29 U.S.C. § 185, seeking orders directing an employer to rehire employees who were discharged in violation of a collective bargaining agreement — -but they include some reasoning that addresses more generally whether § 4(a) prohibits injunctions against employers.
de Arroyo rejected a “literal” application of § 4(a) sought by an employer, because the court’s “understanding of the legislative history behind section 4(a)” led it to conclude that § 4(a) “was not intended as a protection for employers.” de Arroyo, 425 F.2d at 290-91. Rather, the court said: “The ‘remain in any relation of employment’ language in section 4(a), which forms the basis of the Company’s literal interpretation, was used, we think, simply to make clear that employee strikes could not be enjoined either if the employees claimed to have ceased or refused to work temporarily or if they claimed to have completely ended their employment relation with their employer.” Id. at 291. Citing § 4(b) of the Act, which proscribes an injunction to prohibit “[becoming or remaining a member of any labor organization or of any employer organization,” the court reasoned that “the drafters did specifically include employers when protection was intended for them.” Id.[4] The Players, based on de Arroyo and Lumber & Sawmill Workers, urge that § 4(a) applies only to employees, with the first clause — “perform any work” — directed to “temporary work stoppages” and the second clause — “remain in any relation of employment” — aimed solely at “permanent work stoppages.”
With due respect to these courts, we think it better to begin the analysis with the text of § 4(a). The introductory clause of § 4 forbids a court to issue an injunction to prohibit “any person or persons participating or interested” in a labor dispute from doing any of the acts set forth below, including those in § 4(a). Employers, of course, are among the persons participating in a labor dispute. The introductory clause thus plainly encompasses employers. If language in a particular subsection is applicable on its face to employees and employers alike (or to employers alone), then there is no need for a specific mention of employers. An employer against whom injunctive relief is sought may invoke the protection of a subsection as a “person ... participating or interested” in the labor dispute. This court already has recognized that § 4(c) applies to injunctions against employers, Local Union No. 881, United Rubber, Cork, Linoleum, & Plastic Workers v. Bridgestone/Firestone, Inc., 61 F.3d 1347, 1352, 1355 (8th Cir.1995), so the premise of de Arroyo and Lumber & Sawmill Workers that employers are protected against injunction under § 4 only when specifically mentioned in § 4(b) is a non-starter under circuit precedent. See also Bodecker, 640 F.2d at 185-86 (holding that intra-union dispute over funding stock acquisition and profit-sharing plans by payroll deferrals was a “labor *676 dispute,” and explaining that district court had refused to issue injunction against employer’s implementation of payroll deferrals because it was forbidden by § 4(c)).[5]
The disputed language in § 4(a) — “remain in any relation of employment” — may apply to an employer. Section 3 of the Act makes clear that both employers and employees can be in a “relation of employment.” Section 3(b) contemplates that either party to a labor agreement can agree to “withdraw from an employment relation.” 29 U.S.C. § 103(b).
The term “any” is an expansive modifier for “relation of employment,” and especially where the Supreme Court has emphasized the breadth of the NLGA’s prohibition on injunctions, it would be odd to apply a narrow construction of “any relation of employment.” Cf. Ali v. Fed. Bureau of Prisons, 552 U.S. 214, 219-20 & n. 4, 128 S.Ct. 831, 169 L.Ed.2d 680 (2008). We therefore reject a reading of the phrase that would limit the acts encompassed by the second clause of § 4(a) to refusing to remain in any relation of employment whatsoever, as with a permanent and complete work stoppage. The phrase is more naturally read to mean refusing to remain in any particular relation of employment, whether or not the refusal is complete and permanent. This reading corresponds to the meaning of “any” in the first clause of § 4(a), which refers to a refusal “to perform any work.” In that clause, “any” does not mean that the prohibition applies only when there is a refusal to perform any work whatsoever, but rather it forbids an injunction against even a refusal to perform any particular work — including a certain type of work, see Jacksonville Bulk Terminals, 457 U.S. at 704-05, 102 S.Ct. 2672; cf. Bedford Cut Stone, 274 U.S. at 42-43, 47 S.Ct. 522, or a certain amount of work, see Teledyne Wis. Motor v. Local 288, United Auto., Aerospace & Agric. Implement Workers, 530 F.2d 727, 728-30 (7th Cir.1976) — even when there is not a complete work stoppage. The term “any” should be given the same meaning in both clauses of § 4(a). See Sullivan v. Stroop, 496 U.S. 478, 484, 110 S.Ct. 2499, 110 L.Ed.2d 438 (1990).
So understood, the phrase “refusing ... to remain in any relation of employment” encompasses a non-permanent work stoppage. To “remain” is “[t]o continue unchanged in place, form, or condition,” Webster’s New International Dictionary 1802 (1932), or “[t]o continue, as in one place, condition, or character.” Funk & Wagnalls New Standard Dictionary 2082 (1931). While a strike or lockout may not permanently end a relation of employment, it changes the condition or character of that relationship. As one court of the era expressed it: “The relation of employer and employe[e] is temporarily suspended during a strike.” Tri-City Cent. *677 Trades Council v. Am. Steel Foundries, 238 F. 728, 733 (7th Cir.1917).
Other contemporaneous judicial decisions show that Congress likely would have understood “refusing to remain in any relation of employment” as including a non-permanent work stoppage such as a strike or lockout of employees. In his dissent in Duplex Printing, Justice Brandeis remarked that the very acts to which § 20 of the Clayton Act applied “sever the continuity of the legal relationship” between employer and employee. 254 U.S. at 488, 41 S.Ct. 172 (Brandéis, J., dissenting). The Brandéis dissent cited a separate opinion in Iron Molders’ Union No. 125 v. Allis-Chalmers Co., 166 F. 45 (7th Cir.1908), where a concurring judge described the “somewhat anomalous relationship” between employees and employers during a strike or lockout: “Manifestly, then, pending a strike or a lock out, and as to those who have not finally and in good faith abandoned it, a relationship exists between employer and employee that is neither that of the general relation of employer and employee, nor again that of employer looking among strangers for employees, or employees seeking from strangers employment.” Id. at 52-53 (Grosscup, J., concurring). Other courts went so far as to hold that striking workers were no longer “employees” for purposes of the Clayton Act, either at the outset or after some duration of a strike. See Canoe Creek Coal Co. v. Christinson, 281 F. 559, 561-62 (W.D.Ky.1922); Dail-Overland Co. v. Willys-Overland, Inc., 263 F. 171, 188 (N.D.Ohio 1920). For these reasons, we believe a reasonable legislator in 1932 would have understood a strike or lockout of employees as a refusal to “remain in [a] relation of employment.” See also 75 Cong. Rec. 5489 (1932) (“[T]he [Clayton] Act could not be successfully invoked when once the employer had refilled vacancies, because, it was held, there was no longer a relationship existing of employer and employee between the owner of the plant and the striker. A worker who picketed was no longer an employee to come under the protection of the Clayton Act. (See Dail-Overland Co. v. Willys-Overland, 263 F. at 192.)”) (remarks of Rep. Celler).
It is true that if § 4(a) is construed to include a lockout of employees, then the section is not symmetrical. Contrary to the League’s suggestion, Appellants’ Reply Br. at 16, we do not think the second clause should be understood as applying only to employers. But cf. Local Union No. 861 of IBEW v. Stone & Webster Eng’g Corp., 163 F.Supp. 894, 896 (W.D.La.1958). Employees may refuse to perform work under the first clause, and they may refuse to remain in a relation of employment under the second. There is likely overlap between the two clauses, and courts (including the Supreme Court) have cited both clauses in holding that a strike may not be enjoined. Buffalo Forge Co. v. United Steelworkers, 428 U.S. 397, 410, 96 S.Ct. 3141, 49 L.Ed.2d 1022 (1976); Order of R.R. Telegraphers, 362 U.S. at 335, 80 S.Ct. 761; Waller Bros. Stone Co. v. United Steelworkers, 620 F.2d 132, 136-37 (6th Cir.1980) (quoting Buffalo Forge); U.S. Steel Corp. v. United Mine Workers, 519 F.2d 1236, 1242, 1245 (5th Cir.1975); Wilson & Co. v. Birl, 105 F.2d 948, 951 (3d Cir.1939).
The employer, by contrast, does not perform work, so it may invoke only the second clause. Insofar as an employer’s lockout extends to acts by other employers who refuse to take in the “late employees” of the first employer, see Iron Molders’ Union No. 125, 166 F. at 50, the terms of § 4(a) do not forbid an injunction against refusing to offer new work or employment. The lack of symmetry, however, does not render § 4(a) inapplicable to employers altogether. The evenhanded introductory *678 clause of § 4 still forbids a court to enjoin “any person or persons” in a labor dispute from “refusing ... to remain in any relation of employment.” That the terms of § 4(a) afford employers less protection against injunctions than they afford employees (who were, after all, the target of the controversial injunctions that prompted the NLGA) does not mean that Congress gave employers no protection at all.
Aside from the text and structure of § 4, the Players argue that the policy of the NLGA and the legislative history support their position that § 4(a) offers no protection to employers. To be sure, the policy stated in § 2 is that the individual unorganized worker should be free from the interference, restraint, or coercion of employers in the designation of representatives, self-organization, or other concerted activities. But it does not follow that a prohibition on injunctions against employer lockouts is contrary to the policy of the Act. The Supreme Court has observed that while the Act was designed to protect workingmen, the broader purpose was “to prevent the injunctions of the federal courts from upsetting the natural interplay of the competing economic forces of labor and capital.” Bhd. of R.R. Trainmen v. Chi. River & Ind. R.R. Co., 353 U.S. 30, 40, 77 S.Ct. 635, 1 L.Ed.2d 622 (1957) (emphasis added). An employer’s lockout is part of this interplay; it is not the equivalent of a judicial injunction that interferes with the ability of workers to exercise organized economic power.
The Court elsewhere explained that “powerful judicial dissents,” such as that of Justice Brandéis in Duplex Printing, urged that labor disputes were an “area of economic conflict that had best be left to economic forces and the pressure of public opinion and not subjected to the judgment of courts.” Hutcheson, 312 U.S. at 231, 61 S.Ct. 463. In support of that view, the Brandéis dissent cited this excerpt from the 1915 Report of the Committee on Industrial Relations:
There are apparently, only two lines of action possible: First to restrict the rights and powers of employers to correspond in substance to the powers and rights now allowed to trade unions, and second, to remove all restriction which now prevent the freedom of action of both parties to industrial disputes, retaining only the ordinary civil and criminal restraints for the preservation of life, property and the public peace. The first method has been tried and failed absolutely. ... The only method therefore seems to be the removal of all restrictions upon both parties, thus legalizing the strike, the lockout, the boycott, the blacklist, the bringing in of strike-breakers, and peaceful picketing.
Duplex Printing, 254 U.S. at 486 n. 2, 41 S.Ct. at 184 n. 7 (Brandeis, J., dissenting) (emphasis added); see also 75 Cong. Rec. 5478 (1932) (remarks of Rep. LaGuardia) (“If the courts had administered even justice to both employers and employees, there would be no need of considering a bill of this kind now.”); id. at 4915 (remarks of Sen. Wagner) (“The policy and purpose which give meaning to the present legislation is its implicit declaration that the Government shall occupy a neutral position, lending its extraordinary power neither to those who would have labor unorganized nor to those who would organize it and limiting its action to the preservation of order and the restraint of fraud.”). A one-way interpretation of § 4(a) — prohibiting injunctions against strikes but not against lockouts — would be in tension with the purposes of the Norris-LaGuardia Act to allow free play of economic forces and “to withdraw federal courts from a type of controversy for which many believed they were ill-suited and from participation in which, it was feared, judicial prestige might suffer.” Marine Cooks & Stewards, *679 362 U.S. at 369 n. 7, 80 S.Ct. 779. We are not convinced that the policy of the Act counsels against our textual analysis of § 4(a). Cf. Am. Med. Ass’n v. United States, 317 U.S. 519, 535, 63 S.Ct. 326, 87 L.Ed. 434 (1943) (“It is not our province to define the purpose of Congress apart from what it has said in its enactments, and if [a party’s] activities fall within the classes defined by the [Clayton and Norris-LaGuardia] acts, we are bound to accord [the party] ... the benefit of the legislative provisions.”).[6]
The Players also contend that the legislative history of the NLGA shows that § 4(a) prohibits only injunctions against employees. They cite a House Committee Report, which states that § 4 was “intended by more specific language” to overcome the effects of judicial decisions that upheld injunctions against workers. H.R. Rep. 72-669, at 728 (1932). They point as well to then-Professor Frankfurter’s treatise, which characterized § 4(a) as “declaratory of the modern common law right to strike.” Felix Frankfurter & Nathan Greene, The Labor Injunction 217-18 (1930). Cf. Textile Workers Union v. Lincoln Mills, 353 U.S. 448, 469 n. 3, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957) (Frankfurter, J, dissenting). These materials indicate that Members of Congress, and Professors Frankfurter and Greene as drafters of proposed legislation, were determined to forbid federal courts from entering injunctions against workers participating in labor disputes. But they do not address the specific question whether § 4(a) also prohibits injunctions against employers.[7]
Other materials cited by the League suggest that Members of Congress did contemplate that employers could invoke the plain language of § 4(a), although they do not address the precise question either. S.Rep. No. 72-163, at 19 (1932) (“[I]t will be observed that this section [§ 6], as do most all of the other prohibitive sections of the bill, applies both to organizations of labor and organizations of capital. The same rule throughout the bill, wherever it is applicable, applies both to employers and employees, and also to organizations *680 of employers and employees.”) (emphasis added); 75 Cong. Rec. 4507 (1932) (“Wherever it can be done this bill applies equally to organizations of labor and to organizations of capital. Organizations of employees and organizations of capital are treated exactly the same.”) (remarks of Sen. Norris) (emphasis added); id. at 4509 (“[This bill] attempts to weigh in the scales of justice all the elements which ought to be considered in passing upon controversies between labor and capital. It asks for the laboring man nothing that it does not concede to the corporation.”) (emphasis added); see also Edward B. Miller, Antitrust Laws & Employee Relations 15-25 (1984). As is often the case, the legislative history offers something for both parties, but it does not supply a convincing basis to depart from our analysis of the text.
One last point raised by the Players is that § 4(a) of the NLGA merely paraphrases language in § 20 of the Clayton Act that forbade injunctions prohibiting “any person or persons, whether singly or in concert, from terminating any relation of employment, or from ceasing to perform any work or labor.” 29 U.S.C. § 52; see Frankfurter & Greene, at 217. They contend that the Supreme Court in American Steel Foundries v. Tri-City Central Trades Council, 257 U.S. 184, 203, 42 S.Ct. 72, 66 L.Ed. 189 (1921), authoritatively construed a related portion of § 20 as applying only to employees, and that Congress should be understood to have incorporated this “settled meaning” when it enacted the Norris-LaGuardia Act. By way of post-argument submission, they also draw our attention to the legislative history of the Clayton Act. E.g., S.Rep. No. 63-698, at 51 (1914) (“The words ‘singly or in concert’ are inserted ... to guard the right of workingmen to act together in terminating, if they desire, any relation of employment, and to act together and in concert in doing or abstaining from doing any other of the acts named in that paragraph of the section.”).
We do not agree that American Steel Foundries established the asserted meaning. The cited portion of the case did not concern the specific clauses that evidently were paraphrased in § 4(a) of the NLGA, and because the case arose from an injunction issued against employees, the court addressed § 20 of the Clayton Act only as it applied to employees. There was no question raised in the case about whether or how § 20 and the “terminating any relation of employment” clause applied to employers.
When the Second Circuit later addressed the Clayton Act in a discussion of multiemployer collective bargaining, it reasoned that “[a]lthough Congress was largely concerned with the effect of [federal court] interference on unions, the statute was phrased in an evenhanded fashion to protect employer conduct in labor disputes as well as that of unions. Section 20 thus exempted from federal prohibition ‘persons ... terminating any relation of employment ... or withholding ... moneys or things of value,’ language that would permit multiemployer lockouts.” NBA v. Williams, 45 F.3d 684, 689 (2d Cir.1995) (quoting 29 U.S.C. § 52); see Brown, 50 F.3d at 1055 (quoting Williams, 45 F.3d at 689); see also 51 Cong. Rec. 14,334 (1914) (“[T]he paragraph is reciprocal.”) (remarks of Sen. Thomas). We need not here decide whether the Clayton Act protects multiemployer lockouts; it is sufficient for present purposes that the NLGA incorporated no settled judicial interpretation that § 20 applied only to employees.
For these reasons, we conclude that § 4(a) of the Norris-LaGuardia Act deprives a federal court of power to issue an injunction prohibiting a party to a labor dispute from implementing a lockout of its *681 employees. This conclusion accords with the few decisions that have addressed the specific question. Clune v. Publishers’ Ass’n of N.Y.C., 214 F.Supp. 520, 528-29 (S.D.N.Y.), aff'd, 314 F.2d 343, 344 (2d Cir.1963) (per curiam); Plumbers & Steamfitters Local 598 v. Morris, 511 F.Supp. 1298, 1311 (E.D.Wash.1981); Stone & Webster Eng’g Corp., 163 F.Supp. at 896.[8] Because the Norris-LaGuardia Act prohibits the district court from issuing an injunction against the League’s lockout of employees, the court’s order cannot stand.
B.
Another portion of the injunction is not foreclosed by § 4(a). The district court enjoined not only the League’s lockout of employees, ie., players under contract, but also the League’s refusal to deal with non-employees, i.e., free agents and prospective players or “rookies.” As to these latter groups of players, § 4(a) does not apply. The refusal of the League and NFL clubs to deal with free agents and rookies is not a refusal “to remain in any relation of employment,” for there is no existing employment relationship in which “to remain.”
An injunction with respect to the League’s actions toward free agents and rookies, however, cannot be issued except in strict conformity with § 7 of the NLGA, 29 U.S.C. § 107, because this is “a case involving or growing out of a labor dispute.” Id. §§ 101, 107. The present injunction does not conform to § 7.
We disagree with the Players that the League forfeited its claim that the injunction must comply with § 7 by failing to raise the point in its brief in the district court. The district court raised the applicability of § 7 at oral argument, at which time the League argued that further procedures were required. Appellants’ App. 521-23. The district court did not treat the point as forfeited or waived, concluding only that it was unnecessary to address § 7 because the court thought the NLGA wholly inapplicable. Brady I, 779 F.Supp.2d at 1026 n. 41, 2011 WL 1535240, at *23 n. 41. And this court has considered compliance with the NLGA even when the issue was not raised in the district court. Ozark Air Lines, Inc., 797 F.2d at 562.
Section 7 provides that a court has no authority to issue an injunction “except after hearing the testimony of witnesses in open court (with opportunity for cross-examination) in support of the allegations of a complaint made under oath, and testimony in opposition thereto.” 29 U.S.C. § 107. Although a hearing is not required where the party enjoined does not contest on appeal that the relevant facts are undisputed, Kansas City S. Transp. Co. v. Teamsters Local Union No. 41, 126 F.3d 1059, 1067-68 (8th Cir.1997), the League does contest the facts in this case, and it is entitled to test the credibility of the Players’ evidence by cross-examination. Section 7(c) requires the court to evaluate the relative harms to the parties, and the court’s calculus with respect to free agents and rookies undoubtedly was affected by its view that the entire lockout could be enjoined. Whether to enter an injunction requiring the League to deal with free agents and rookies, only to have these players locked out as soon as they enter into any new contract of employment, was *682 not considered. The League also raises arguments concerning § 7(a) and § 7(e), which should be addressed by the district court in the first instance as necessary. Compare, e.g., Mackey, 543 F.2d at 623, and Donnelly Garment Co. v. Dubinsky, 154 F.2d 38, 43 (8th Cir.1946), with E. St. Louis Laborers’ Local 100 v. Bellon Wrecking & Salvage Co., 414 F.3d 700, 708 (7th Cir.2005), and Wilson & Co., 105 F.2d at 950-52. We therefore conclude that the injunction as a whole must be vacated.
IV.
Given our conclusion that the preliminary injunction did not conform to the provisions of the Norris-LaGuardia Act, we need not reach the other points raised by the League on appeal. In particular, we express no view on whether the League’s nonstatutory labor exemption from the antitrust laws continues after the union’s disclaimer. The parties agree that the Act’s restrictions on equitable relief are not necessarily coextensive with the substantive rules of antitrust law, and we reach our decision on that understanding. See Burlington Northern, 481 U.S. at 435 n. 3, 107 S.Ct. 1841; Order of R.R. Telegraphers, 362 U.S. at 339 n. 15, 80 S.Ct. 761; Milk Wagon Drivers’ Union, Local No. 753 v. Lake Valley Farm Products, Inc., 311 U.S. 91, 103, 61 S.Ct. 122, 85 L.Ed. 63 (1940); Burlington N. Santa Fe. Ry. Co. v. Int’l Bhd. of Teamsters Local 171, 203 F.3d 703, 712 n. 12 (9th Cir.2000) (en banc); cf. Hutcheson, 312 U.S. at 234-36, 61 S.Ct. 463; L.A. Meat & Provision Drivers Union v. United States, 371 U.S. 94, 107 n. 2, 83 S.Ct. 162, 9 L.Ed.2d 150 (1962) (Goldberg, J., concurring).
The district court’s order of April 25, 2011, granting a preliminary injunction is vacated, and the case is remanded for further proceedings.

. That section provides, in relevant part: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several Stales, or with foreign nations, is declared to be illegal.”

. Several retired professional football players brought a similar but separate action on March 28, 2011, also seeking a preliminary injunction. The district court consolidated the two actions, and denied the retired players’ motion for a preliminary injunction as moot after issuing an injunction in the previously filed action.

. Section 5 provides that "[n]o court of the United States shall have jurisdiction to issue a restraining order or temporary or permanent injunction upon the ground that any of the persons participating or interested in a labor dispute constitute or are engaged in an unlawful combination or conspiracy because of the doing in concert of the acts enumerated in section 104 of this title.” 29 U.S.C. § 105.

. The Sixth Circuit reached the opposite conclusion, holding that § 4(a) of the NLGA prohibits an injunction in a § 301 action requiring an employer to reinstate an employee who was discharged in violation of a collective bargaining agreement. Heheman v. E.W. Scripps Co., 661 F.2d 1115, 1124-25 (6th Cir.1981). This court has cited de Arroyo for the general proposition that a court has discretion to award equitable relief by way of reinstatement in a § 301 action, Tatum v. Frisco Transp. Co., 626 F.2d 55, 60 (8th Cir.1980); Butler v. Local Union 823, Int’l Bhd. of Teamsters, 514 F.2d 442, 455 (8th Cir.1975), but has not discussed § 4(a) of the NLGA in that context.

. The Players also rely on Brotherhood of Locomotive Engineers v. Baltimore & Ohio Railroad Co., 310 F.2d 513 (7th Cir.1962), which held that the NLGA did not deprive a district court of power to grant an injunction that prohibited railroad carriers from putting into effect revisions in work rules in a dispute governed by the Railway Labor Act. The court reasoned that "the purpose of Congress” in enacting the NLGA "was to protect only employees and unions,” and found "nothing in the statement of policy to indicate any intention to deny jurisdiction to issue injunctions against employers.” Id. at 518. To the extent that the Seventh Circuit would apply this broad reasoning outside the context of the Railway Labor Act, but cf. Chi. Midtown Milk Distribs., Inc. v. Dean Foods Co., Nos. 18577, 18578, 1970 WL 2761, at *1 (7th Cir. July 9, 1970) (per curiam), it is inconsistent with this court’s precedent that § 4 applies to injunctions against employers, Bridgestone/Firestone, 61 F.3d at 1352, 1355, and with the Players’ acknowledgment that an injunction against an employer lockout in a labor dispute must conform to § 7 of the NLGA. Appellees' Br. at 43 n.3.

. The First Circuit in de Arroyo said that the employer’s interpretation of § 4(a) in that case "completely disregard[ed] the primary purpose behind the anti-injunction provisions,” 425 F.2d at 290-91, but that case did not involve a lockout, and the court observed in the same discussion that “the reemployment of improperly discharged employees can hardly be said to be one of the abuses sought to be eliminated by the Norris-LaGuardia Act.” Id. at 291. See also Lumber & Sawmill Workers, 663 F.2d at 986-87 (discussing policy reasons that favor according federal courts power to order reinstatement of employees discharged in violation of collective bargaining agreements).

. The Players argue that the Senate’s rejection of an amendment that would have included “employers” in the policy statement of § 2, 75 Cong. Rec. 4766, demonstrates that "Congress had no intent to relieve employers of any liability under the antitrust laws.” Appellees' Br. 46-47 (internal quotation omitted). This bit of history does not alter our view of § 4(a). “Statements by opponents of a bill and failure to enact suggested amendments, although they have some weight, are not the most reliable indications of congressional intent.” Bryant v. Yellen, 447 U.S. 352, 376, 100 S.Ct. 2232, 65 L.Ed.2d 184 (1980); see Florey v. Sioux Falls Sch. List. 49-5, 619 F.2d 1311, 1315 (8th Cir.1980). Other features of the proposed NLGA amendment may have contributed to its defeat. See 75 Cong. Rec. 4762-65 (1932). The argument also proves too much, because even without mention of employers in § 2, the Act expressly restricts the issuance of injunctions against employers in circumstances that might otherwise violate the antitrust laws. See Cal. State Council of Carpenters v. Associated Gen. Contractors of Cal., Inc., 648 F.2d 527, 544-45 (9th Cir.1980) (discussing 29 U.S.C. § 104(b)), rev’d on other grounds, 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983). At any rate, we consider here only the scope of a district court's authority to issue injunctions, not the liability of employers under the antitrust laws.

. In Chicago Midtown Milk Distributors, 1970 WL 2761, at *1, the Seventh Circuit reversed an injunction prohibiting two companies from refusing to supply and sell processed milk and other dairy products to certain distributors. The complaint alleged that "a refusal to deal based upon a lockout” violated the Sherman Act. In holding that the injunction was precluded by the NLGA, the court cited only § 1 of the Act. The court's reasoning is not well explained, and the opinion does not directly address § 4(a).